T.C. Memo. 2011-63

UNITED STATES TAX COURT

ALBERT J. STARNES, TRANSFEREE, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5199-09, 5200-09,      Filed March 15, 2011.
            5201-09, 5202-09.

Erik P. Doerring and Jeffrey T. Allen, for petitioners.

David B. Flassing, Frank W. Dworak, and James M. Cascino, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  Estate of Sallie C. Stroupe, Deceased, Daniel R. Stroupe, Executor, Transferee, docket No. 5200-09; Ronald D. Morelli, Senior, Transferee, docket No. 5201-09; and Anthony S. Naples, Transferee, docket No. 5202-09.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Pursuant to separate notices of transferee liability, respondent determined that Albert J. Starnes (Starnes), Ronald D. Morelli, Senior (Morelli), Anthony S. Naples (Naples), and Sallie C. Stroupe (Stroupe) (collectively, Tarcon shareholders) are each liable to the extent of $649,034 as transferees for the Federal income tax liability of $855,237, penalty of $342,094, and interest assessed to Tarcon, Inc. (Tarcon) for 2003.  After the Internal Revenue Service (IRS) sent the notice of liability to Stroupe, but before the petition was filed in docket No. 5200-09, she died and her assets and liabilities passed to the Estate of Sallie C. Stroupe.  The cases were consolidated for purposes of trial, briefing, and opinion.

The issue for decision is whether petitioners are liable as transferees pursuant to section 6901 for Tarcon's unpaid tax, penalty, and interest for 2003.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  At the time their petitions were filed, petitioners Starnes, Naples, and

Daniel R. Stroupe, executor of the Estate of Sallie C. Stroupe, resided in North Carolina, and petitioner Morelli resided in South Carolina.

Tarcon (a C corporation at all relevant times) was organized in North Carolina in 1956 and operated a freight consolidation business. In the early 1970s, the Tarcon shareholders each acquired 25 percent of Tarcon's stock and became members of Tarcon's board of directors and officers of Tarcon. Naples was president, Starnes was executive vice president, Morelli was senior vice president, and Stroupe was secretary and treasurer.

In the 1980s, Tarcon's business operations and revenues declined because of deregulation of the trucking industry. By 2003, Tarcon was no longer in the freight consolidation business, and its primary business was leasing warehouse space in the approximately 201,600-square-foot industrial building it owned located on approximately 18.56 acres on Granite Street in Charlotte, North Carolina (Granite Street property).

In addition to the Granite Street property, Tarcon owned four vehicles and a condominium in Garden City, South Carolina, during 2003. On May 12, 2003, the South Carolina property was sold and Tarcon received net proceeds of $190,752 that were deposited into Tarcon's bank account. On October 30, 2003, the Tarcon shareholders each purchased one of the four Tarcon

vehicles, and their personal moneys paid were deposited into Tarcon's bank account.

The Tarcon shareholders discussed marketing the Granite Street property for sale in early 2003.  In February 2003, Brad Cherry (Cherry), a commercial real estate broker with Keystone Partners, L.L.C., was hired to act as an agent and adviser in connection with leasing and/or a potential sale of the Granite Street property or a sale of Tarcon stock.  Almost one-half of the building space and some parking lot space were already rented.  Tarcon entered into a listing agreement for lease and/or sale with Keystone Partners on February 20, 2003.

In April and May 2003, multiple parties, including ProLogis, sent letters of intent to purchase the Granite Street property to Cherry.  Other parties expressed an interest in purchasing Tarcon's stock.

In May 2003, Cherry learned of MidCoast Investments, Inc. (including its affiliates MidCoast Credit Corp. and MidCoast Acquisitions Corp., hereinafter referred to as MidCoast), as a prospective purchaser of Tarcon's stock.  A MidCoast representative sent a letter dated May 21, 2003, to Cherry that stated:

> MidCoast is interested in purchasing the stock of certain C-corporations that have sold business assets and/or real estate.  In instances where a C-corporation has sold assets for a gain, MidCoast may have an interest in purchasing 100% of the stock from the

shareholders for a price greater than the net value of the corporation.

MidCoast pursues these acquisitions as an effective way to grow our parent company's core asset recovery operations. It is important to note that after we complete a stock acquisition, the target company is not dissolved or consolidated, but is reengineered into the asset recovery business and becomes an income producer for us going forward. * * *

Cherry forwarded a MidCoast informational brochure and confidentiality agreement with a letter dated May 27, 2003, to Morelli. In his letter, Cherry noted:

it appears that this is something that they do often, but also something in which I am definitely out of my league. I would like to encourage you, when the time is appropriate, to involve both your accountant and a lawyer to help advise us through this transaction should it move forward.

The brochure outlined purported benefits of undertaking a transaction with MidCoast including:

P Shareholders sell stock of Company.
P Shareholders maximize net after-tax proceeds.
P MidCoast bridges gap between Shareholders' desire to sell stock and buyer's desire to buy assets.
P Company maximizes sale of all assets (i.e., written-off receivables, etc.).

    *      *      *      *      *      *      *

P Should Company sell part or all of its assets to a third party, MidCoast does not interfere with asset sale negotiations or closing.
P Flexibility to include/exclude any remaining assets/liabilities in the Company.
P Reduction of exposure to future claims, losses, and litigation:
    P MidCoast replaces Shareholders as owner of Company.

P MidCoast puts Company into asset recovery business and operates Company on a go-forward basis.
P Company is not dissolved, liquidated, or merged into another Company.
P MidCoast causes the Company to satisfy its tax and other liabilities.

Sale negotiations continued with multiple prospective purchasers. Cherry communicated with Morelli regarding the various offers, and Morelli then discussed terms of the offers and developments with the other Tarcon shareholders.

On June 23, 2003, ProLogis submitted a revised letter of intent with respect to purchasing the Granite Street property.

On June 30, 2003, two MidCoast representatives met with Cherry and the Tarcon shareholders, along with their accountant and attorney, in North Carolina. At the meeting, the MidCoast representatives presented information similar to that in the brochure and explained that MidCoast had undertaken a number of transactions of this type. The representatives reiterated that if MidCoast purchased Tarcon, Tarcon would continue to operate under MidCoast's ownership and that the 2003 Tarcon tax liabilities would be satisfied.

After the meeting, on behalf of the Tarcon shareholders, Morelli and Cherry negotiated with MidCoast regarding the Tarcon stock purchase price. Morelli entered the negotiations with the goal of obtaining a share purchase price of $2,800,000. MidCoast proposed a purchase price based on a formula that applied a

percentage to the outstanding calculated tax liabilities for the current year. Thus, negotiations primarily focused on the percentage applied to the tax liabilities to determine the share purchase price.

The Tarcon shareholders decided that Tarcon should sell the Granite Street property to ProLogis and the Tarcon stock to MidCoast. Accordingly, on behalf of Tarcon, Morelli executed a letter of intent dated July 7, 2003, to sell the Granite Street property to ProLogis. On July 16, 2003, on behalf of Tarcon, Morelli executed a letter of intent to sell the Tarcon stock to MidCoast. The MidCoast letter of intent outlined that the share purchase price was equal to Tarcon's cash as of the share closing less 56.25 percent of the local, State, and Federal corporate income tax liabilities resulting to Tarcon for its current fiscal year. MidCoast also agreed to reimburse the shareholders and Tarcon for legal and accounting fees incurred in connection with the share closing in an amount not to exceed $25,000.

MidCoast engaged the law offices of Womble, Carlyle, Sandridge, and Rice (Womble) in Charlotte, North Carolina, to assist with the Tarcon stock acquisition.

On or about July 30, 2003, Tarcon entered into an agreement of purchase and sale with ProLogis for the Granite Street property. Subsequently, the agreement was amended in September and October 2003, establishing a reduced purchase price of

$3,180,000 and extending the due diligence period.  On October 30, 2003, the Granite Street property closing with ProLogis took place, and Tarcon received net proceeds of $2,567,901.83.

As of October 31, 2003, after the Granite Street property transaction, Tarcon had $3,091,955.54 cash in its bank accounts and no tangible assets.  Tarcon's accountant prepared a pro forma Form 1120, U.S. Corporation Income Tax Return, for Tarcon for January 1 through October 31, 2003.  The total gain from the sale of the building and land, with dates acquired of January 1, 1978, and dates sold of October 30, 2003, was calculated as $2,366,915.  The accountant calculated that as of October 31, 2003, Tarcon had a Federal income tax liability of approximately $733,699 plus State tax liabilities that resulted in a total of $881,627.74.  The accountant sent the prepared return to Stroupe and to the Tarcon shareholders' attorney on November 5, 2003.  The Tarcon shareholders' attorney communicated with MidCoast representatives and the Womble attorney handling the Tarcon stock transaction regarding the Tarcon financial information prepared after the Granite Street property sale, including the tax liabilities and account balances as of October 31, 2003, MidCoast's due diligence progress, and anticipated closing procedures.

On November 13, 2003, the Tarcon shareholders entered into a share purchase agreement with MidCoast that included a share purchase price of $2,596,136.94.  The purchase price was

calculated by multiplying the Federal and State tax liabilities, calculated through October 31, 2003, of $881,627.74 by 56.25 percent and deducting this amount, $495,915.60, from Tarcon's $3,092,054.54 cash ($3,091,955.54 plus interest earned in November). MidCoast also agreed to reimburse Tarcon shareholders for legal and accounting fees not to exceed $25,000, for a total amount due from MidCoast of $2,621,136.94.

The share purchase agreement outlined that

> After the Closing, the combined state and federal tax liability of the Company [Tarcon] (the "Deferred Tax Liability") will be Eight Hundred Eighty-One Thousand Six Hundred Twenty-Seven and 74/100 Dollars ($881,627.74). Other than the Deferred Tax Liability, the Company has no Liabilities * * *

The agreement stated that MidCoast would "file all Federal and state income tax returns related to the Deferred Tax Liability on a timely basis, including extensions" and that MidCoast's

> sole responsibility for preparation of tax returns and payment of taxes arising prior to the Closing shall be for filing the Company's state and federal income tax returns for the Company's fiscal year ending December 31, 2003 and paying the federal and state income taxes, if any, attributable thereto.

The sale of Tarcon stock to MidCoast was scheduled to close on or before November 14, 2003. Before the closing, the Tarcon shareholders officially resigned from their Tarcon positions, gave their original Tarcon share certificates to their attorney, and transferred the cash in the Tarcon accounts to their

attorney's escrow account. The Tarcon stock sale closing was to take place at the Womble offices according to the share purchase agreement.

On November 13, 2003, the Tarcon shareholders' attorney hand delivered the Tarcon share certificates and other original closing documents to Womble's office. Additionally, on November, 13, 2003, the Tarcon cash was transferred from the Tarcon shareholders' attorney's escrow account to the Womble trust account.

On November 13, 2003, MidCoast transferred $2,621,136.94 to the Womble trust account according to the share purchase agreement and the share purchase price outlined therein.

The executed closing statement, also dated November 13, 2003, outlined the deposits to the Womble trust account for the Tarcon stock sale closing as (1) Tarcon's cash balance of $3,092,052.54, from the Tarcon shareholders' attorney and (2) $2,621,136.94 from MidCoast for the purchase price and reimbursement amount, for a total of $5,713,189.48. The listed disbursements from the Womble trust account related to the closing were: (1) Total sale proceeds payable to sellers (the Tarcon shareholders) of $2,596,136.94, with $649,034.23 payable to each of Morelli and Naples and $649,034.24 payable to each of Starnes and Stroupe; (2) legal and accounting fees reimbursement

payable of $25,000; and (3) $3,092,052.54 wired to Tarcon's "post-closing" bank account, for a total of $5,713,189,48.

Following the closing statement, Womble's disbursement ledger identified a wire transfer of $3,092,052.54 to Tarcon debited November 13, 2003. However, contrary to this disbursement ledger and the closing statement, the closing attorney at Womble signed a trust account wire transfer request form to transfer funds from the Womble trust account to the "MidCoast Credit Corp. Operating Account". The Womble trust account bank records show that this transfer occurred November 13, 2003. The Womble trust account disbursement information was not a part of the closing documents or available to the Tarcon shareholders at the closing.

On November 14, 2003, $3,092,052.54 was wired from the MidCoast operating account to a new Tarcon account. The new Tarcon account was at the same bank as MidCoast's operating account where the money was wired from the Womble trust account on November 13, 2003.

After the Tarcon stock sale closing, the Tarcon shareholders had no further communications with MidCoast or knowledge with respect to Tarcon's funds. The Tarcon shareholders reported their respective Tarcon stock sale proceeds on their timely filed 2003 individual Federal income tax returns.

On November 26, 2003, $3,092,052.54 was transferred out of the new Tarcon account. A document prepared by the IRS identified a Tarcon account with a different bank as receiving a deposit of $3,092,052.54 before December 1, 2003. In November 2003, MidCoast sold the stock of Tarcon to Sequoia Capital, L.L.C. (Sequoia), for $2,861,465.96.

The IRS received Tarcon's Form 1120 for 2003 on July 26, 2004. The form reported a Nevada address for Tarcon. An attached Form 4797, Sales of Business Property, identified two entries under Part III, Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255, as (1) Building & Improvements with a total gain of $1,557,315 and (2) Land with a total gain of $1,009,483. Both reported dates acquired as January 1, 1978, and dates sold as October 30, 2003.

The Form 4797 also reported ordinary losses of $1,950,000 for "DKK/USD BINA" as property held 1 year or less with an acquired date of December 29, 2003, and a sold date of December 31, 2003. This resulted in a claimed loss of $392,685, after deducting the building and improvements gain. The Tarcon 2003 Form 1120 also included a Schedule D, Capital Gains and Losses, that reported the $1,009,483 gain from the land as a long-term capital gain. Also reported on Schedule D was a short-term capital loss of $1,010,000 for "INT RATE SWAP OPTI", with an acquired date of December 29, 2003, and a sold date of December

31, 2003. The 2003 Tarcon tax return reported no tax due. On the return, it was reported that Tarcon's net assets per books at the end of the tax year consisted of $132,320 cash.

On March 27, 2005, the IRS received Tarcon's Form 1120 for 2004, which reported no tax due.

In 2005, the IRS undertook a promoter penalty examination of MidCoast. The IRS also examined Tarcon and determined an income tax deficiency of $855,237 for 2003. The IRS sent a notice of deficiency dated April 11, 2007, to Tarcon at the Nevada address. The deficiency primarily resulted from the IRS' disallowing losses claimed for the interest rate swap option sold on December 31, 2003, and DKK/USD BINA sold that same date. An attached explanation stated:

> It is determined that the short-term capital loss and loss from the sale of the inflated basis assets are not allowed. You have failed to prove that the disposition of the inflated basis assets generated a bona fide loss. In addition, it is determined that the inflated basis assets transaction lacked economic substance. Accordingly, taxable income is increased $2,959,483.00 for taxable year ending December 31, 2003.

In the notice, the IRS also determined an accuracy-related penalty under section 6662(h) of $342,094.

Tarcon did not file a petition with this Court to contest the IRS determinations outlined in the notice of deficiency. On September 17, 2007, the IRS assessed the taxes and penalties determined in the notice of deficiency, plus interest of $298,310. Tarcon did not pay any portion of the assessment, and

in March 2008 the IRS filed Federal tax liens with the Clerk of Superior Court Union County, Monroe, North Carolina; the Clerk of Superior Court Mecklenburg County, Charlotte, North Carolina; the North Carolina Secretary of State, Raleigh, North Carolina; and the County Recorder Clark County, Las Vegas, Nevada.  Tarcon has not paid any portion of the deficiency, penalty, or interest for the underlying 2003 assessment.

In December 2008, the IRS sent notices of transferee liability to each of the Tarcon shareholders.  The notices identified Tarcon as the transferor with an outstanding tax liability of $855,237 and accuracy-related penalty under section 6662(h) of $342,094 for 2003.  The notices identified the amount each Tarcon shareholder received for the sale of Tarcon shares, and stated that, as a transferee, each shareholder's liability is limited to that received amount (not including applicable interest).

An attached notice of liability statement explained that the IRS did not respect the "purported stock sale" by shareholders of Tarcon to MidCoast and that "the stock sale and the transactions involving the sale of Tarcon, Inc's. assets to ProLogis * * * are determined to be, in substance, a sale of the assets of Tarcon, Inc., followed by a distribution by Tarcon, Inc. of its proceeds to its shareholders".  The attachment further explained that the transaction is "substantially similar to an Intermediary

transaction shelter described in Notice 2001-16, 2001-1 C.B. 730," or, alternatively, the transaction is in substance a sale of the Tarcon assets to ProLogis followed by a redemption of Tarcon stock owned by the Tarcon shareholders.

The IRS did not make adjustments to or issue a statutory notice of deficiency with respect to any of the Tarcon shareholders' 2003 Federal income tax returns.

OPINION

Section 6901(a) provides that the liability, at law or in equity, of a transferee of property "shall * * * be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." Section 6901(a) does not independently impose tax liability upon a transferee but provides a procedure through which the IRS may collect unpaid taxes owed by the transferor of the assets from a transferee if an independent basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts. Commissioner v. Stern, 357 U.S. 39, 45 (1958); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993). Thus, State law determines the elements of liability, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability. Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), affg. 35 T.C.

1148 (1961). The IRS bears the burden of proving that the transferee is liable as a transferee of property of a taxpayer, but not to prove that the taxpayer was liable for the tax. Sec. 6902(a); Rule 142(d).

The existence and extent of transferee liability is determined by the law of the State where the transfer occurred-- in this case, North Carolina. See Commissioner v. Stern, supra at 45. North Carolina has adopted the Uniform Fraudulent Transfer Act (NCUFTA) that provides creditors with certain remedies, including avoidance, when a debtor makes a fraudulent transfer. If avoidance of a transfer is established, a creditor, subject to some limitations, may obtain an attachment or other provisional remedy against the asset transferred or other property of the transferee. N.C. Gen. Stat. sec. 39-23.7(a) (2003).

The NCUFTA provides that transfers to present and future creditors are fraudulent when:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Id. sec. 39-23.4(a).

Additionally, transfers are fraudulent to present creditors according to the NCUFTA where:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Id. sec. 39-23.5.

The creditor must establish the existence of a fraudulent transfer to avoid the transfer. See Allman v. Wappler (In re Cansorb Indus. Corp.), Adv. No. 07-6072 (Bankr. M.D.N.C. Nov. 20, 2009) (slip op. at 11). The standard of proof to be applied is determined by State law. See, e.g., LR Dev. Co. LLC v. Commissioner, T.C. Memo. 2010-203 (applying Illinois law to determine the Commissioner's standard of proof). It appears that

North Carolina courts have not decided what standard applies in NCUFTA cases.

Petitioners argue that under applicable North Carolina law, respondent must establish by clear and convincing evidence, and not merely by a preponderance of the evidence, the existence of a fraudulent transfer for petitioners to be held liable as transferees. Respondent contends that the preponderance of the evidence standard should be applied because North Carolina courts apply this standard to general fraud cases. We do not decide what standard North Carolina courts might apply because, considering the evidence and arguments herein, our application of either standard renders the same results. Respondent argues that the transfer should be avoided because it was fraudulent and that NCUFTA sections 39-23.4(a)(1) and (2) and 39-23.5(a) are satisfied.

NCUFTA Section 39-23.4(a)(2)

Under NCUFTA section 39-23.4(a)(2), a transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor: (1) Was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to

incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The Uniform Fraudulent Transfer Act is a uniform act that derived the phrase "reasonably equivalent value" from 11 U.S.C. section 548 of the Federal Bankruptcy Code. See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 577 (7th Cir. 1998). Reasonably equivalent value has been construed to include both direct and indirect benefits to the transferor, even if the benefit does not increase the transferor's net worth. See id. at 578; Miller v. First Bank, 696 S.E.2d 824, 827-830 (N.C. Ct. App. 2010). Reasonably equivalent value is "a question of fact as to which the court is to be given considerable latitude to make a determination by considering all the facts and circumstances surrounding the transaction in question." Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC), 298 Bankr. 62, 73 (Bankr. W.D.N.C. 2002). What constitutes reasonably equivalent value is determined from the standpoint of the debtor's creditors. See Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.), 956 F.2d 479, 484 (4th Cir. 1992); Miller v. First Bank, supra at 827-830. The party claiming that the transaction was fraudulent bears the burden of proving that no reasonably equivalent value was received. See Cooper v. Ashley Commcns., Inc. (In re Morris Commcns. NC, Inc.), 914 F.2d 458, 474-475 (4th Cir. 1990). Thus,

respondent must show that Tarcon did not receive reasonably equivalent value in exchange for the stock.

Respondent first argues that Tarcon received nothing because the share purchase agreement between the Tarcon shareholders and MidCoast did not specifically identify a money transfer to Tarcon with respect to the sale. However, the share purchase agreement identified the purchase price and closing date and stated that the consummation of the purchase and sale of the Tarcon shares would occur at the Womble offices. The closing statement, prepared by Womble, outlined the disbursements that would occur, including $3,092,052.54 to Tarcon, "wired to post-closing bank account". According to the share purchase agreement and closing documents, MidCoast paid $2,596,136.94 for the Tarcon stock. Thus, there was an infusion of cash into the transaction, not a circular flow of cash.

Respondent next asserts that Tarcon did not receive any consideration because the Womble closing attorney did not disburse the moneys according to the closing statement. The Womble attorney wired $3,092,054.54 to a MidCoast bank account, from which it was transferred to the new Tarcon account the day after closing. Although the record reveals this is accurate, it does not show that Tarcon did not receive a "reasonably equivalent value" for the stock. See <u>Mancuso v. T. Ishida USA, Inc. (In re Sullivan)</u>, 161 Bankr. 776, 781 (Bankr. N.D. Tex.

1993) (noting that courts generally compare the value of the property transferred with the value of the property received in exchange for the transfer). The moneys were first wired to a MidCoast account and MidCoast, as the new owner of Tarcon, did not retain the funds or make them unavailable to Tarcon but deposited those moneys in a newly established Tarcon account. From respondent's viewpoint, as creditor, although the funds were transferred first to a MidCoast bank account, they were not made unavailable to satisfy Tarcon's liabilities, but were transferred into a Tarcon account the following day.

Respondent argues alternatively that if the transfer of cash to the new Tarcon account is regarded as part of the cashflows of the Tarcon stock sale, then the subsequent transfer of the bulk of these funds out of the Tarcon accounts within 3 weeks must also be considered in determining whether Tarcon received reasonably equivalent value. Respondent contends that Tarcon never "meaningfully received" any moneys and cites United States v. Tabor Court Realty Corp., 803 F.2d 1288, 1302-1303 (3d Cir. 1986), and Wieboldt Stores, Inc. v. Schottenstein, 94 Bankr. 488, 502-504 (N.D. Ill. 1988), as situations where "back-to-back fund transfers" were collapsed as a single integrated cash transfer under the Uniform Fraudulent Conveyances Acts (predecessor to the Uniform Fraudulent Transfer Act) of the relevant States. Both cases involved leveraged buyouts (LBOs).

In <u>Wieboldt Stores, Inc. v. Schottenstein</u>, <u>supra</u> at 493, the court explained:

> The LBO reduced the assets available to Wieboldt's creditors. Wieboldt contends that, after the buyout was complete, Wieboldt's debt had increased by millions of dollars, and the proceeds made available by the LBO lenders was paid out to Wieboldt's then existing shareholders and did not accrue to the benefit of the corporation. Wieboldt's alleged insolvency after the LBO left Wieboldt with insufficient unencumbered assets to sustain its business and ensure payment to its unsecured creditors. * * *

In <u>Wieboldt</u>, the court concluded that the various LBO transfers should be collapsed into one transaction after reviewing the knowledge and intent of the parties involved in the transaction.

In <u>United States v. Tabor Court Realty Corp.</u>, <u>supra</u> at 1302-1304, the court held that, when a series of transactions were part of one integrated transaction, courts may look beyond the exchange of funds and collapse the individual transactions of an LBO and then consider the net effect on the creditors. See also <u>Liquidation Trust of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Grp.</u>, 327 Bankr. 537, 546-547 (D. Del. 2005), affd. 278 Fed. Appx. 125 (3d Cir. 2008). Courts with cases appealable to the Court of Appeals for the Third Circuit have applied three factors to determine whether to collapse multiple transactions: (1) Whether all of the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own, and (3) whether each transaction was dependent or conditioned on the others. See <u>Mervyn's LLC v. Lubert-Adler Grp.</u>

IV, LLC, 426 Bankr. 488, 497-498 (D. Del. 2010); Liquidation Trust of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Grp., supra at 546-547.  Respondent has not addressed factors two and three, above.  In determining whether to collapse multiple transactions, another court stated that the party arguing that the transaction should be avoided must prove that the multiple transactions were linked and that the purported transferee had "'actual or constructive knowledge of the entire scheme'" that renders the purported transferee's exchange with the debtor fraudulent.  See Sullivan v. Messer (In re Corcoran), 246 Bankr. 152, 160 (E.D.N.Y. 2000) (quoting and citing HBE Leasing Corp. v. Frank, 48 F.3d 623, 635, 636 n.9 (2d Cir. 1995)).

Some courts have collapsed transactions in contexts other than LBOs.  See, e.g., Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., 284 Bankr. 355, 370-371 (Bankr. S.D.N.Y. 2002); In re Best Prods. Co., 157 Bankr. 222, 229-230 (Bankr. S.D.N.Y. 1993) (collapsing sublease between subsidiary and parent corporation which was used as mere financing vehicle and treating loan as having been made directly to parent corporation).  "Where a transfer is actually 'only a step in a general plan,' an evaluation is made of the entire plan and its overall implications."  Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., supra at 370 (quoting Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir.

1993)).  To render the initial transferee's exchange with a debtor fraudulent, that transferee must have had either actual or constructive knowledge of the entire scheme.  See HBE Leasing Corp. v. Frank, supra at 635; Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., supra at 370-371.

In all contexts, courts generally review whether all of the parties involved had knowledge of the multiple transactions.  The evidence does not establish that the Tarcon shareholders had actual knowledge of Tarcon's postclosing activities.

Constructive knowledge may be found where the initial transferee became aware of circumstances that should have led to further inquiry into the circumstances of the transaction, but no inquiry was made.  See HBE Leasing Corp. v. Frank, supra at 636. MidCoast represented to the Tarcon shareholders that Tarcon would continue to exist after the stock sale and would engage in the asset recovery business.  Further inquiry by the Tarcon shareholders, who were also officers and directors of Tarcon, was likely warranted considering that they ultimately received proceeds from the sale of their Tarcon stock that exceeded the Tarcon cash on hand, less the calculated tax liabilities as of October 31, 2003.  The Tarcon shareholders failed to do so.

However, respondent bears the burden of proof.  Respondent's contention that the Tarcon shareholders "could not have believed

MidCoast planned to generate a profit with Tarcon in that manner" following the closing of the Tarcon stock sale is insufficient to support a finding that the Tarcon shareholders had constructive knowledge of the entire "scheme", including the sale of Tarcon to Sequoia and Sequoia's subsequent purchase and sale of "inflated basis assets" to purportedly generate losses for Tarcon. Thus, we do not collapse the transactions to determine whether Tarcon received a reasonably equivalent value.

With respect to the stock sale transaction, the Tarcon shareholders received a total of $2,596,136 for the Tarcon shares, and $3,092,052 was deposited into the new Tarcon account the day after the stock sale closing. Tarcon also retained the outstanding Federal and State tax liabilities totaling $881,627.74, calculated as of October 31, 2003. Thus, the $3,092,052 cash in the new Tarcon account after the stock closing was sufficient to pay these outstanding calculated liabilities. Nothing in the record shows that Tarcon had value, or not, beyond the cash and liabilities transferred. Thus, we cannot conclude that Tarcon did not receive a reasonably equivalent value. See generally <u>Cooper v. Ashley Commcns., Inc. (In re Morris Commcns. NC, Inc.)</u>, 914 F.2d at 466 ("'The critical time is when the transfer is "made." Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given.'"

(quoting Collier on Bankruptcy, par. 548.09, at 116 (15th ed. 1984)).

NCUFTA Section 39-23.4(a)(1)

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with intent to hinder, delay, or defraud any creditor of the debtor. N.C. Gen. Stat. sec. 39-23.4(a)(1). In determining intent under this section, consideration may be given, among other factors, to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent
shortly after the transfer was made or the obligation
was incurred;

(10) The transfer occurred shortly before or shortly
after a substantial debt was incurred;

(11) The debtor transferred the essential assets of the
business to a lienor who transferred the assets to an
insider of the debtor;

(12) The debtor made the transfer or incurred the
obligation without receiving a reasonably equivalent
value in exchange for the transfer or obligation, and
the debtor reasonably should have believed that the
debtor would incur debts beyond the debtor's ability to
pay as they became due; and

(13) The debtor transferred the assets in the course of
legitimate estate or tax planning.

Id. sec. 39-23.4(b).

Proof of the existence of any one or more of these factors may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation. See id. sec. 39-23.4 Official Comment (5); Rentenbach Constructors, Inc. v. C.M. Pship., 639 S.E.2d 16, 18 (N.C. Ct. App. 2007) (holding that although Official Comment to a section of North Carolina's Uniform Commercial Code was not binding because it was not enacted into law, it could be used to ascertain legislative intent).

To prevail under this section of the NCUFTA, respondent must show that the transfer was made "With intent to hinder, delay, or

defraud" creditors.  Respondent contends that factors 1, 5, 7, 8, 9, 10, and 12 of NCUFTA section 39-23.4(b) are present.

Factor 1.  The Transfer or Obligation Was to an Insider.

The Tarcon shareholders were insiders as officers, directors, and persons in control of Tarcon before the sale of Tarcon stock to MidCoast.  See N.C. Gen. Stat. sec. 39-23.1(7)(b) (2003).  However, without collapsing the transactions, respondent has not shown that the transfers to the Tarcon shareholders were from Tarcon, not MidCoast.

Factor 5.  The Transfer Was of Substantially All the Debtor's Assets.

Respondent again contends that the Tarcon sale to MidCoast should be disregarded and argues that the Tarcon cash constituted substantially all of Tarcon's assets.  Because respondent failed to show that the transaction should be collapsed under North Carolina law, this factor does not support a finding of fraudulent intent.

Factor 7.  The Debtor Removed or Concealed Assets.

Respondent contends that the Tarcon shareholders removed the Tarcon cash from the Federal and State tax authorities' reach by transferring it to the Womble account and then receiving it into their own bank accounts.  We do not find this persuasive because after the stock sale closing, cash exceeding the calculated outstanding tax liabilities was deposited into a Tarcon bank account.

Factor 8.  The Value of the Consideration Received by the Debtor Was Reasonably Equivalent to the Value of the Asset Transferred or the Amount of the Obligation Incurred.

Respondent again makes the argument that Tarcon received no consideration in exchange for the transfer of the Tarcon cash out of its bank accounts.  We conclude, above, that this argument fails.

Factor 9.  The Debtor Was Insolvent or Became Insolvent Shortly After the Transfer Was Made or the Obligation Was Incurred.

"A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." N.C. Gen. Stat. sec. 39-23.2(a) (2003).  Additionally, a debtor is presumed insolvent if the debtor is "generally not paying the debtor's debts as they become due".  Id. sec. 39-23.2(b).

After the transfer, moneys in the Tarcon account exceeded the outstanding Federal and State tax liabilities, calculated as of October 31, 2003.  Tarcon's 2003 Form 1120 reported $132,320 in net assets at the end of the tax year.  Respondent has not provided other evidence to show that Tarcon was insolvent or became insolvent shortly after the transfer date.

Factor 10.  The Transfer Occurred Shortly Before or Shortly After a Substantial Debt Was Incurred.

Arguably, a transfer occurred shortly after Tarcon incurred the State and Federal tax liabilities as calculated for the asset sale in 2003.  However, respondent has not shown that Tarcon

transferred funds to the Tarcon shareholders leaving Tarcon with moneys insufficient to satisfy the tax liabilities, calculated as of October 31, 2003.

> Factor 12.  <u>The Debtor Made the Transfer or Incurred the Obligation Without Receiving a Reasonably Equivalent Value in Exchange for the Transfer or Obligation, and the Debtor Reasonably Should Have Believed that the Debtor Would Incur Debts Beyond the Debtor's Ability to Pay as They Became Due</u>.

As discussed above, respondent has not shown that a reasonably equivalent value was not received.

After weighing the factors, and recognizing that no one factor is dispositive, we conclude that respondent has not shown that a transfer was made with intent to hinder, delay, or defraud respondent.

<u>NCUFTA Section 39-23.5(a)</u>

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.  N.C. Gen. Stat. sec. 39-23.5(a).

Respondent is required to show that Tarcon made a transfer without receiving reasonably equivalent value in exchange for the

transfer and that Tarcon was insolvent at that time or became insolvent as a result of the transfer.  See id.  As discussed above with respect to the requirement of NCUFTA section 39-23.4(a)(2), respondent has not shown that Tarcon made a transfer without receiving reasonably equivalent value in exchange.  Thus, we conclude that the requirements of NCUFTA section 39-23.5(a) have not been satisfied.

Liability Under North Carolina's Trust Fund Doctrine

Respondent argues that petitioners are liable as Tarcon's transferees under the North Carolina trust fund doctrine. Respondent asserts that the four elements of North Carolina's trust fund doctrine are:

> (1) a transferee receives assets from a corporation, (2) the transferee pays inadequate or no consideration for those assets, (3) the transferring corporation is insolvent or rendered insolvent by the transfer, and (4) the transferee knew or should have known of the existence of the transferor's liabilities.

In Snyder v. Freeman, 266 S.E.2d 593, 597-601 (N.C. 1980), the court explained that

> Directors of a corporation are trustees of property of the corporation for the benefit of the corporate creditors as well as shareholders.  It is their duty to administer the trust * * * for the mutual benefit of all parties interested * * *.  North Carolina adheres to the "trust fund doctrine," which means, in a sense, that the assets of a corporation are regarded as a trust fund, and the officers and directors occupy a fiduciary position in respect to stockholders and creditors, which charges them with the preservation and proper distribution of those assets. * * * [Citations and quotation marks omitted.]

However, directors do not owe a fiduciary duty to creditors of a corporation, except where circumstances exist "amounting to a 'winding-up' or dissolution of the corporation. Balance sheet insolvency, absent such circumstances, is insufficient to give rise to breach of a fiduciary duty to creditors of a corporation." Whitley v. Carolina Clinic, Inc., 455 S.E.2d 896, 899-900 (N.C. Ct. App. 1995).

We conclude above that respondent has not shown that Tarcon was insolvent, and respondent has not presented evidence regarding circumstances that existed amounting to a winding up or dissolution of Tarcon aside from claiming that Tarcon no longer had a business activity. Without a determination that circumstances exist amounting to a winding up or dissolution, the Tarcon shareholders, as directors, do not owe a fiduciary duty to respondent under North Carolina law. Thus, we need not address the trust fund elements as outlined by respondent, and do not address whether those elements are indeed an accurate distillation according to North Carolina law. Respondent has failed to carry his burden of establishing that petitioners are liable under the trust fund doctrine according to North Carolina law.

We conclude that respondent has not established that a fraudulent transfer occurred under North Carolina law or that the North Carolina trust fund doctrine applies. We have considered

all arguments of the parties.  Those not addressed are irrelevant, without merit, or moot.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for petitioners</u>.