WYNN, Circuit Judge,
dissenting:
This case involves a straightforward transaction made complicated so as to facilitate the fraudulent avoidance of a tax liability. Simply put, the petitioners, former shareholders of Tarcon, reduced the sole asset of Tarcon to cash by selling that asset, a warehouse, for $3,180,000. After that October 30, 2003 sale, Tarcon had $3,091,955 in its bank account and no tangible assets. As a result of the warehouse sale, Tarcon incurred a federal tax liability of $733,699 and a North Carolina tax liability of $147,931, for a total of $881,628. If the story had ended there, the four former shareholders, each of whom owned 25 percent of Tarcon, would have completed the liquidation of Tarcon by paying those tax liabilities and dividing the remaining sum, allowing each to receive a distribution of approximately $552,582.
Of course, the story doesn’t end there. Instead, MidCoast entered with a fraudulent scheme that would allow the former shareholders to avoid paying their $881,628 tax liability. Under its proposal, MidCoast would pay the former shareholders $2,621,136 for their Tarcon stock and legal fees; in return, Tarcon would transfer its sole asset, roughly $3.1 million in cash, to MidCoast. Why, though, would the shareholders turn over Tarcon’s $3.1 million to MidCoast and receive only $2.6 million in return?
The answer is evident when Tarcon’s outstanding tax liabilities of $881,627 are factored into the equation. Indeed, it then becomes clear that the former shareholders actually negotiated to be paid $2.6 million in cash — for cash that in reality totaled only $2,210,425,[1] resulting in a *441 windfall of $410,711. That windfall was, in fact, a cut from Tarcon’s $881,627 tax liability, transferred to MidCoast when it purchased the former shareholders’ stock, and which it undoubtedly was scheming to avoid under the guise of offering an “asset recovery premium.” While I recognize the intricacies of MidCoast’s subsequent actions to avoid paying the full liability of $881,627,[2] this transaction cannot escape its ultimately simple label: a transparent scam designed by the parties to fraudulently evade paying taxes. Accordingly, I must respectfully dissent.
I.
This is a case about transferee liability under 26 U.S.C. § 6901. As such, I take issue with the majority’s conclusion that it need not address the threshold question of whether the former shareholders are in fact transferees. The majority dismisses as “immaterial,” ante at 428-29, what I view as a critical analytical difference between the substantive state law in Kentucky at issue in Commissioner v. Stern, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958), and the North Carolina Uniform Fraudulent Transfer Act (NCUFTA), N.C. Gen.Stat. § 39-23.1 et seq., that controls in this case.
In Stem, the question of whether the beneficiary widow was a transferee was irrelevant under Kentucky law, as she would not have been liable in either instance for her deceased husband’s unpaid income tax deficiencies. Stern, 357 U.S. at 45-46, 78 S.Ct. 1047. In this case, by contrast, and as noted by the majority opinion, North Carolina law may indeed impose liability on the former shareholders, but only if there was a fraudulent transfer and they are transferees under federal law. See, e.g., N.C. Gen.Stat. §§ 39-23.4, 39-23.5 (voiding certain types of transfers as fraudulent, which under § 6901 would in turn allow for the imposition of substantive liability on the transferees in such transactions).
Equally significant, the question of whether the former shareholders are transferees is inextricably linked with, and informed by, which transaction is under review. In another significant distinction from Stem, there was no dispute in that case that a transfer from the original taxpayer to the beneficiary widow had occurred; here, however, depending on which transaction is considered, there was no transfer from Tarcon, the debtor owing taxes. Put another way, for § 6901 and Stem to apply and North Carolina law to determine the former shareholders’ liability, the former shareholders must be transferees — but they are only transferees if they received a “transfer” as part of the transaction under review.
Notwithstanding these material distinctions, the majority opinion, relying on *442 Stem, assumes arguendo that the former shareholders are transferees — but then proceeds to analyze the stock sale between MidCoast and the former shareholders as the sole transaction relevant under North Carolina law. The problem, of course, is that the “form” of that transaction was structured such that the former shareholders received Tarcon’s assets only indirectly: there was no direct “transfer” between Tarcon and the former shareholders. As such, the majority reviews a transaction in which the former shareholders are not actually transferees, while assuming that they are, an internal inconsistency in which I cannot concur.[3]
II.
In my view, the Tax Court and this Court must make the threshold determination of which transaction is properly under review, which in turn informs the dispositive issue here of whether the former shareholders are properly characterized as transferees under § 6901. See generally Frank Lyon Co. v. United States, 435 U.S. 561, 581 n. 16, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) (“The general characterization of a transaction for tax purposes is a question of law subject to review.”); Va. Historic Tax Credit Fund 2001 LP v. Comm’r of Internal Revenue, 639 F.3d 129, 142 (4th Cir.2011) (same).
A.
To answer that initial question, I look to this Court’s precedent:
A taxpayer may not ... claim tax benefits that Congress did not intend to confer by setting up a sham transaction lacking any legitimate business purpose, or by affixing labels to its transactions that do not accurately reflect their true nature. Accordingly, under the “economic substance doctrine,” a transaction may be disregarded as a sham for tax purposes if the taxpayer “was motivated by no business purposes other than obtaining tax benefits” and “the transaction has no economic substance because no reasonable possibility of a profit exists.” Rice’s Toyota World, Inc. v. Comm’r, 752 F.2d 89, 91 (4th Cir.1985). Similarly, the doctrine of “substance over form” recognizes that the substance of a transaction, rather than its form, governs for tax purposes. See, e.g., W. Va. N. R.R. Co. v. Comm’r, 282 F.2d 63, 65 (4th Cir.1960) (“It is well settled that in matters of taxation substance rather than form prevails and that the taxability of a transaction is determined by its true nature rather than by the name which the parties may use in describing it.”).
BB&T Corp. v. United States, 523 F.3d 461, 471 (4th Cir.2008).[4] We have further *443 instructed that “[i]n applying the doctrine of substance over form, we ‘look to the objective economic realities of a transaction rather than to the particular form the parties employed.’” Id. at 472 (quoting Frank Lyon, 435 U.S. at 573, 98 S.Ct. 1291 (alteration omitted)).
Here, the “objective economic realities” establish that the former shareholders effectively wound up Tarcon and received liquidating distributions of its cash as a result of the stock sale to MidCoast. As noted in the Tax Court’s Memorandum, it is undisputed that “[b]y 2003, Tarcon was no longer in the freight consolidation business, and its primary business was leasing warehouse space” at a property in Charlotte.[5] Starnes v. Comm’r of Internal Revenue, T.C. Memo 2011-63, 2011 WL 894608, *1 (2011). Thus, the transaction to sell the warehouse to ProLogis reduced all of Tarcon’s assets to cash, with no apparent plan to use those monies to commence another business activity. The Share Purchase Agreement also explicitly acknowledged that “[ijmmediately prior to the Closing and at Closing, the Company shall possess assets consisting of cash in an amount not less than the sum of $3,092,052.54, and the Company shall be subject to no Liabilities other than the Deferred Tax Liability” of $881,627.74. J.A. 249.[6] By their own admission, the former shareholders had decided to retire and sell either Tarcon’s assets or its stock, effectively liquidating the company.
However, after being contacted by Mid-Coast, the former shareholders agreed to sell their stock directly to MidCoast. This decision was surely driven by MidCoast’s representations, as outlined in the majority opinion, that “[wjith a liquidation, the Former Shareholders would effectively be taxed twice,” whereas “[wjith a stock sale, they would only be taxed once.” Ante at 421-22. Indeed, it is undisputed that “negotiations primarily focused on the percentage applied to the tax liabilities to determine the share purchase price.”[7] Starnes, T.C. Memo 2011-63, 2011 WL 894608, at *3 (emphasis added).
Even more telling, the Share Purchase Agreement included the condition that “[t]he Company ... deliver() to [Mid-Coast] ... all of the Company’s monies by wire transfer ... in the amount of” $3, 092, 052.54. J.A. 249 (emphasis added). There was no discernible “legitimate business purpose” for this transfer of Tarcon’s cash to MidCoast; at closing, Mid-Coast already had complete control over all of Tarcon’s assets and accounts by virtue of its ownership of all of Tarcon’s shares.
Based on these objective realities — and despite its “form” — the sale to MidCoast was not a true sale of stock. Rather, the “substance” of the transaction reflects that the purported sale was no more than a cash-for-cash swap in which the former shareholders received MidCoast’s $2.6 million in exchange for transferring Tarcon’s $3.1 million. Because cash is fungible, this exchange is no different in substance than *444 if the former shareholders had received outright distributions of Tarcon’s cash. See Owens v. Comm’r of Internal Revenue, 568 F.2d 1233, 1239 (6th Cir.1977) (explaining that “when a corporation owns just cash ... the corporation has already been effectively liquidated[.]”); Lowndes v. United States, 384 F.2d 635 (4th Cir.1967) (disregarding a purported sale of stock in four subsidiaries of Bethlehem Steel Company that had ceased operating and held only cash). In Owens, the Sixth Circuit explained that:
In view of these circumstances of the sale, ... [the purchasers] did not assume the risks of a business. What taxpayer actually sold ... was the right to distribute a quantity of cash to themselves. Moreover, that right to a distribution of cash was in substance no different than the cash that taxpayer received for the stock. Exclusive control of [the company] was transferred to [the purchasers]. There were no obstacles to the immediate withdrawal of the cash in [the company’s] bank account. [The purchasers] were given the right to draw on the [company’s] bank account in return for taxpayer being given the right to draw on [the purchaser’s] bank account. The parties were simply exchanging cash.
568 F.2d at 1240 (internal citations omitted). This type of exchange of cash, which “does not affect a taxpayer’s beneficial interest,” “serve[s] no other purpose than tax avoidance.” Id. (citing Haberman Farms, Inc. v. United States, 305 F.2d 787 (8th Cir.1962)); see also Rice’s Toyota World, Inc. v. Comm’r of Internal Revenue, 752 F.2d 89, 91 (4th Cir.1985) (holding that the form of a transaction may be disregarded as a sham for tax purposes if the taxpayer “was motivated by no business purposes other than obtaining tax benefits”).
B.
Having determined that the relevant transaction for review is not the stock sale, but the effective liquidation of Tarcon, the next issue for consideration is whether, with respect to that transaction, the former shareholders are “transferees” within the meaning of § 6901. If they are, then North Carolina law applies to determine the “existence and extent” of their liability. Stern, 357 U.S. at 45, 78 S.Ct. 1047.
Under § 6901, a “transferee of property” is liable for income taxes “in the same manner and subject to the same provisions and limitations as in the ease of the taxes with respect to which the liabilities were incurred” by the taxpayer. 26 U.S.C. § 6901(a). A “transferee” is further defined as including a “donee, heir, legatee, devisee, and distributee.” Id. § 6901(h). Again, because cash is fungible, the former shareholders effectively received distributions of Tarcon’s assets during liquidation, with MidCoast as a mere conduit. As such, the former shareholders meet the definition of “transferees.”
Moreover, because the Share Purchase Agreement did not require that Tarcon get anything in return for its $3.1 million, this transfer was plainly fraudulent under North Carolina law, as it cannot fairly be said that it “receiv[ed] a reasonably equivalent value in exchange for the transfer.” N.C. GemStat. § 39 — 23.5(a); In re Jeffrey Bigelow Design Grp. Inc., 956 F.2d 479, 484 (4th Cir.1992) (“What constitutes reasonably equivalent value is determined from the standpoint of the debtor’s creditors.” (quotation and citation omitted)). Moreover, until MidCoast voluntarily moved the $3.1 million back into a new Tarcon account the following day, Tarcon did, albeit temporarily, “bec[o]me insolvent as a result of the transfer.” N.C. Gen. Stat. § 39-23.5(a).
*445 The majority opinion dismissively refers to the transfer "from Tarcon to MidCoast as an “apparent mistake” and a temporary “detour” of Tarcon’s cash, ante at 424, apparently because, although the $3.1 million was initially transferred into Mid-Coast’s account, it was returned to Tar-con’s post-closing account the next day, per the closing statement. Notwithstanding what the closing statement may have said or what happened the next day, it is undisputed that the Share Purchase Agreement required only that Tarcon to deliver all of its cash to the trust account of MidCoast’s attorneys.[8] As a result, the critical transfer here was from Tarcon to Mid-coast, with nothing required to be returned to Tarcon under the express terms of the Share Purchase Agreement.
Even if one assumes, as the majority does, that MidCoast was required to transfer the $8.1 million back to Tarcon, such that Tarcon did receive value, the transfer from MidCoast to the shareholders must also be voided as fraudulent under North Carolina law, and the former shareholders would likewise be liable as transferees. Under that approach, because MidCoast became the debtor when it assumed Tar-con’s tax liabilities by purchasing all of its outstanding shares of stock, its transfer of $2.6 million to the former shareholders— including the “asset recovery premium”— was made with “intent to hinder, delay, or defraud” the IRS.[9] N.C. Gen.Stat. § 39-23.4(a)(1). In other words, the former shareholders would be liable as “transferees of transferees,” as Tarcon transferred its liabilities to MidCoast, and MidCoast in turn transferred cash to the former shareholders. See Butler v. NationsBank, N.A., 58 F.3d 1022, 1026-28 (4th Cir.1995) (finding that indirect transfer was a fraudulent conveyance under predecessor law to NCUFTA).
III.
The record here shows that the former shareholders did not understand what was meant by the “asset recovery business” or what MidCoast actually planned to do with Tarcon, yet they made no inquiries in part because “it wasn’t something [they] wanted to understand,” and MidCoast could do what it wanted with Tarcon once they were paid for their stock. J.A. 824. Faced with a windfall of over $410,000, the former shareholders’ willful blindness is somewhat understandable — but it cannot be allowed to stand, lest this type of sham transaction to avoid paying federal taxes becomes a standard business practice.
When the substance, rather than the form, of these transactions is properly reviewed, it becomes clear that the deal in question was nothing more than a new, more sophisticated version of money laundering. Because I find that the “economic realities” here amounted in substance to a distribution of Tarcon’s cash, less only roughly half of its deferred tax liabilities, to the former shareholders, with a facilitation fee paid to MidCoast, I would re *446 verse the Tax Court and find the former shareholders liable as transferees under § 6901 and North Carolina law. Accordingly, I respectfully dissent.

. Tarcon’s $3.1 million in cash, less its tax liabilities of $881,627, equals $2,210,425 in cash — the true value of Tarcon’s assets.

. The record reflects that less than two weeks after MidCoast purchased Tarcon's stock from the former shareholders, it resold the stock to Sequoia Capital, LLC, a Bermuda company, for approximately $2.8 million. Two days after that, the $3.1 million in Tarcon’s account was transferred to another account, also in Tarcon’s name, with Deutsche Bank AG. On December 1, 2003, over $2.9 million of those funds was transferred to an account in the Cook Islands in the name of Delta Trading Partners, and an additional $126,822 was transferred to a MidCoast bank account.
After that date, Tarcon never had more than $132,320 in any bank account. When the company filed its 2003 federal income tax return, it reported an overall loss and no tax due, based on losses from a purported interest rate swap option and an asset acquired on December 29 and sold on December 31, 2003, offsetting the gains from the sale of the warehouse to ProLogis. The return also stated that the $132,320 represented Tarcon’s sole asset.

. The majority opinion disputes the contention that § 6901 requires courts to determine, when it may not be properly assumed, the threshold issue of whether a person or entity is a "transferee” under federal law for the purposes of § 6901. According to the majority opinion, this question must be answered — if at all — by reference to state substantive law. However, if this is the case, why then is "transferee” specifically defined by federal law to include a "donee, heir, legatee, devisee, and distributee.” 26 U.S.C. § 6901(h). A logical application of the majority opinion would allow state substantive law to redefine, for instance, donees and heirs as something other than potential transferees in clear contravention of § 6901(h).

. Although federal law generally controls which transaction gives rise to the original debtor’s federal tax liability, I note that North Carolina also incorporates substance-over-form principles in its fraudulent-conveyance law. See N.C. Gen.Stat. § 39-23.1(12) & N.C. Comment (defining "transfer” for NCUFTA purposes as "every mode, direct or indirect ... of disposing of or parting with an asset”); Havee v. Belk, 775 F.2d 1209, 1219 (4th Cir.1985) (holding that substance of a transaction, not its form, governs for NCUFTA).

. During the relevant time period, this warehouse was Tarcon's sole remaining asset; other assets including a number of luxury cars and a condominium were either sold prior to the transactions at issue or are otherwise immaterial to the analysis.

. Citations to the joint appendix are abbreviated as "J.A.”

. This so-called "asset recovery premium,” in which MidCoast paid the shareholders 43.75 percent of Tarcon’s deferred tax liability, explains why the former shareholders would enter into the Share Purchase Agreement at all, rather than simply divide and distribute Tarcon’s $3.1 million in cash, less the $881,627 in tax liability. Described less charitably, the "asset recovery premium” sounds quite a bit like a scheme not only to avoid paying taxes, but to profit while doing so.

. Indeed, the movement of Tarcon’s cash— from a Tarcon account, to a MidCoast account, back to a Tarcon account — is strongly suggestive of MidCoast’s leveraging those funds to finance its payment to the former shareholders. At the least, it calls into question whether the Tax Court was correct in its determination that this deal did not involve a circular flow of funds.

. This "intent to hinder” is illustrated by the realities that: (a) the shares of stock received by MidCoast, with an actual value of only $2.2 million, cannot fairly be said to be "reasonably equivalent” to the $2.6 million that was paid; and (b) by paying the "asset recovery premium” to the shareholders, MidCoast reduced its ability to pay Tarcon’s tax liability. See N.C. Gen.Stat. § 39 — 23.4(b)(1) (outlining factors that would show "intent” under the previous section).