T.C. Memo. 2012-154

UNITED STATES TAX COURT

BILLY F. HAWK, JR., GST NON-EXEMPT MARITAL TRUST, TRUSTEE,
TRANSFEREE, NANCY SUE HAWK AND REGIONS BANK,
CO-TRUSTEES, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.   30024-09, 30025-09,          Filed May 30, 2012.
              30026-09, 30515-09.

Dale C. Allen and J. Eric Butler, for petitioners in docket Nos. 30024-09,

30025-09, and 30026-09.

John P. Konvalinka and Richard G. Pearce, Jr., for petitioner in docket No.

30515-09.

Rebecca Dance Harris, for respondent.

───────────────

[1]Cases of the following petitioners are consolidated herewith for the purpose of this opinion:  Estate of Billy F. Hawk, Jr., Trustee, Transferee, Nancy Sue Hawk and Regions Bank, Co-Executors, docket No. 30025-09; Billy F. Hawk, Jr., GST Exempt Marital Trust, Trustee, Transferee, Nancy Sue Hawk and Regions Bank, Co-Trustees, docket No. 30026-09; and Nancy Sue Hawk, Transferee, docket No. 30515-09.

## MEMORANDUM OPINION

WELLS, <u>Judge</u>:  These cases are before the Court on petitioners' motions for summary judgment pursuant to Rule 121 and on respondent's motion for a stay of proceedings.[2]  Respondent determined that petitioners Billy F. Hawk, Jr., GST Non-Exempt Marital Trust, Nancy Sue Hawk and Regions Bank, cotrustees; Estate of Billy F. Hawk, Jr., Nancy Sue Hawk and Regions Bank, coexecutors; Billy F. Hawk, Jr., GST Exempt Marital Trust, Nancy Sue Hawk and Regions Bank, cotrustees; and Nancy Sue Hawk are each liable as transferees for the 2003 Federal income tax liability of Holiday Bowl, Inc., of $965,358 and penalties pursuant to section 6662(b) and (h) of $8,035 and $370,072, respectively.  We must decide two issues:  (1) whether to grant petitioners' motions for summary judgment on the issue of whether petitioners are liable as transferees pursuant to section 6901 for Holiday Bowl's 2003 income tax and related penalties; and (2) whether to grant respondent's motion for a stay of the instant proceedings.

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

The facts set forth below are based upon examination of the pleadings, moving papers, responses, and attachments.

Billy F. Hawk, Jr., died during February 2000, leaving behind his wife of 48 years, Nancy Sue Hawk, and several children. At the time of his death, Mr. Hawk was the majority shareholder and chief executive officer of Holiday Bowl, Inc. (Holiday Bowl), a Tennessee corporation that operated two bowling alleys in Chattanooga, Tennessee. After the administration of Mr. Hawk's estate, all of Mr. Hawk's shares of stock (stock) in Holiday Bowl passed to Mrs. Hawk and the Billy F. Hawk, Jr., Exempt Marital Trust and the Billy F. Hawk, Jr., GST Non-Exempt Marital Trust (trusts).

At the time, Mrs. Hawk had no business experience, and the couple's children disagreed about how to operate Holiday Bowl. Consequently, Mrs. Hawk decided that it would be best to sell Holiday Bowl. Rob Kelley, vice president and trust officer of Regions Bank and cotrustee of the trusts, concurred with Mrs. Hawk's decision. Mrs. Hawk and Mr. Kelley worked with Mr. Hawk's longtime attorney, Wayne F. Thomas with the law firm Chambliss, Bahner & Stophel, to sell Holiday Bowl. They were also assisted by Dan Johnson and Rayleen Colletti, certified public accountants with the firm Johnson, Hickey & Murchison. During

late 2002 Mr. Thomas contacted Sandy Hansell, who specializes in brokering sales of bowling alleys throughout the country. Mr. Hansell subsequently found a purchaser for Holiday Bowl: the Corley family from Massachusetts, who owned New England Bowl, Inc. (New England Bowl). The sale of substantially all of Holiday Bowl's assets to the Corley Family Limited Partnership and New England Bowl was eventually consummated on July 1, 2003.

By March 2003, negotiations between the Corley family and representatives of Holiday Bowl were well underway, and Mr. Hansell considered it likely that the Corley family would purchase Holiday Bowl. In a letter dated March 13, 2003, Mr. Hansell informed Mr. Johnson that MidCoast Credit Corp. or MidCoast Investments, Inc. (MidCoast), might be interested in purchasing the stock of Holiday Bowl following the sale of Holiday Bowl's assets to the Corley family. Mr. Hansell originally had learned of MidCoast during 2001 when he was contacted by Paul Wellington, who explained to Mr. Hansell that MidCoast was interested in acquiring C corporations with significant cash and offered Mr. Hansell a referral fee. Mr. Wellington explained to Mr. Hansell that MidCoast sought to acquire such corporations to use MidCoast's tax loss carryforwards to offset the acquired corporation's tax liability and to then operate the acquired corporation as a subsidiary of MidCoast. Mr. Hansell provided that information in his letter

to Mr. Johnson and provided Mr. Johnson with Mr. Wellington's contact information. Holiday Bowl was the only referral Mr. Hansell ever made to MidCoast.

Mr. Johnson subsequently spoke to Mr. Wellington, and Mr. Wellington related to Mr. Johnson information similar to that which he had given to Mr. Hansell, to wit: MidCoast sought to purchase Holiday Bowl to convert it into a business that would acquire discounted loan portfolios and generate profits by collecting on those loans. Mr. Wellington sent Mr. Johnson materials explaining MidCoast's business model, including its method of acquiring cash-rich corporations with tax liabilities, and those materials stated that MidCoast would satisfy the acquired corporation's tax liabilities.

Ms. Colletti assisted Mr. Johnson in evaluating MidCoast's proposal, and she had several telephone conversations with Mr. Wellington during the summer of 2003. Mr. Wellington explained to Ms. Colletti how MidCoast planned to profit from the purchase of Holiday Bowl's stock. He advised her that the debt collection business in which Holiday Bowl would be engaged after its acquisition by MidCoast would have significant deductions during its first several years of operation, permitting it to defer its tax liabilities. However, he assured her that MidCoast would file Holiday Bowl's 2003 Federal and State tax returns and would eventually

pay Holiday Bowl's deferred income tax. Mr. Wellington provided Ms. Colletti with details regarding MidCoast's accounting methods. Ms. Colletti considered the information supplied by Mr. Wellington and concluded that his explanations were reasonable and that the accounting methods described were permitted by the Internal Revenue Service. Ms. Colletti also believed Mr. Wellington when he told her that MidCoast planned to operate Holiday Bowl as an asset recovery business for a number of years following its acquisition.

Mr. Wellington was also contacted by Kirk Snouffer, an attorney with Chambliss, Bahner & Stophel. Mr. Wellington provided Mr. Snouffer with a list of references for MidCoast. Mr. Snouffer contacted at least two of those references and spoke with them about MidCoast.

In a letter dated August 14, 2003, Mr. Thomas advised Mrs. Hawk and Mr. Kelley that he and other attorneys at Chambliss, Bahner & Stophel had concluded that "it would be a reasonable exercise of * * * [Mrs. Hawk and Mr. Kelley's] discretion to proceed with this transaction provided that MidCoast provides sufficient financial information so we may all be satisfied that it has the financial strength to fulfill its indemnity". In that letter, Mr. Thomas summarized the research and analysis his firm had completed to reach that conclusion as follows:

We have taken various actions in reviewing this potential transaction. We have reviewed the federal tax laws surrounding the transaction; we have discussed MidCoast, its history, business practices and business plans with the President of MidCoast, Michael Bernstein; we have discussed the potential transaction and past similar transactions entered into by MidCoast with the Certified Public Accountant who has assisted MidCoast with these transactions; and we have discussed similar transactions with attorneys who have represented MidCoast and other parties in similar transactions.

*     *     *     *     *     *     *

This transaction appears to work for MidCoast since they have a profit motive and plan to operate the corporation for several years to come. In essence, they plan to leverage their profits by purchasing Holiday Bowl's cash at a discount based on its tax liability and then deferring the actual payment of tax since they have heavy expenses in the early months after a loan portfolio purchase. They have more cash available to purchase loans this way, so they end up making a greater profit in the end.

Based on the discussions with Mr. Bernstein, the accountant, and the attorneys who have represented MidCoast in similar transactions, we have concluded: that MidCoast is involved in a legitimate business; that MidCoast would be benefited by this transaction; and that it has accomplished a number of similar transactions over the past several years, apparently without difficulty with regard to the IRS.

In a letter dated August 19, 2003, Mr. Johnson outlined the research his firm had conducted and summarized the tax consequences of the proposed stock acquisition. In that letter, he wrote that his firm:

made inquiries with key personnel at MidCoast to understand the tax positions that are purported to be taken after the acquisition. Per our discussion with Mr. Wellington and Mr. Bernstein, MidCoast has a clear business purpose and profit motive for acquiring HBI [Holiday Bowl].

MidCoast intends to keep the acquiring corporation in existence and use the leveraged cash to finance the expansion of its asset recovery business. They anticipate that in the first 18 to 24 months after acquisition, HBI will generate substantial net operating losses. However, their overall business plan over the next several years encompasses a substantial profit on the assets acquired.

In conclusion, we find that the proposed stock redemption and subsequent stock sale to MidCoast are viable tax planning strategies. We conclude that the tax treatment and positions can be supported upon scrutiny by the IRS * * *.

On the basis of the research and advice from their attorneys and accountants, Mrs. Hawk and Mr. Kelley decided to sell the Holiday Bowl stock to MidCoast.

The purchase price for the Holiday Bowl stock was calculated by taking the cash assets then held by Holiday Bowl ($4,185,389), adding prepaid taxes ($29,980), and subtracting an amount equal to 64.25% of Holiday Bowl's 2003 tax liability ($791,690). That formula yielded a purchase price of $3,423,679. The parties agreed that the sale of the Holiday Bowl stock would close on November 12, 2003, at the offices of Chambliss, Bahner & Stophel in Chattanooga, Tennessee, unless the parties mutually agreed to close the transaction via mail, fax, or overnight courier.

Mr. Thomas believed that MidCoast was financing the purchase of Holiday Bowl through a combination of cash that it had on hand and a loan from Sequoia Capital, LLC (Sequoia Capital), an offshore entity. During November 2003

Holiday Bowl, Midcoast, and Sequoia Capital entered into an escrow agreement with the law firm Morris, Manning & Martin L.L.P. (Morris Manning). Morris Manning agreed to serve as the escrow agent. Pursuant to that escrow agreement, Holiday Bowl's cash and the purchase funds borrowed by MidCoast from Sequoia Capital were to be deposited in Morris Manning's escrow account and Holiday Bowl's cash was not to be released to MidCoast until the Holiday Bowl shareholders received the purchase price.

The Share Purchase Agreement whereby MidCoast acquired Holiday Bowl's stock stipulated that the purchaser would prepare and file all tax returns and pay all taxes due for the tax period ending December 31, 2003. Mrs. Hawk, Mr. Kelley, and the representatives of Holiday Bowl believed that MidCoast would file tax returns and pay Holiday Bowl's tax liability for its 2003 tax year. None of those individuals expected that, following its acquisition of Holiday Bowl, MidCoast would promptly sell Holiday Bowl to another entity.

However, immediately after the sale of the Holiday Bowl stock closed on November 12, 2003, MidCoast resold the Holiday Bowl stock to Sequoia Capital. On July 8, 2004, Holiday Bowl filed its Form 1120, U.S. Corporation Income Tax Return. It reported a total gain from the sale of its assets on July 1, 2003, of $2,694,726. It also reported losses from transactions described only as "Int Rate

Swap Opti" and "DKK/USD Bina" and reported an overall taxable loss of $1,267,260. During 2005 respondent began an examination of Holiday Bowl's 2003 income tax return and requested that Holiday Bowl provide documents substantiating the claimed losses, but no documentation was provided. On July 11, 2007, respondent issued a notice of deficiency to Holiday Bowl for income tax deficiencies of $965,358, $599, and $2 with respect to Holiday Bowl's 2003, 2004, and 2005 tax years, respectively. Respondent also determined that Holiday Bowl was liable for penalties with respect to its 2003 tax year of $8,035 and $370,072 pursuant to section 6662(b) and (h), respectively.

Before the expiration of the time prescribed by section 6901(c) Mrs. Hawk, individually, and Mrs. Hawk and Mr. Kelley, as cotrustees of the trusts and coexecutors of the Estate of Billy F. Hawk, Jr., timely executed a Form 977, Consent to Extend the Time to Assess Liability at Law or in Equity for Income, Gift, and Estate Tax Against a Transferee or Fiduciary. On September 23 and 29, 2009, respondent timely issued statutory notices of liability setting forth respondent's determination of petitioners' liabilities as transferees.[3] The attached notice of liability statements explained that respondent had determined that Holiday

[3]Respondent issued the notices on September 23, 2009, in the cases at docket Nos. 30024-09 and 30515-09 and on September 29, 2009, in the cases at docket Nos. 30025-09 and 30026-09.

Bowl had been dissolved and that the assets of Holiday Bowl had been transferred to petitioners, who were, directly or indirectly, the shareholders of Holiday Bowl.

Discussion

I.    Summary Judgment

Rule 121(a) allows a party to move "for a summary adjudication in the moving party's favor upon all or any part of the legal issues in controversy."  Rule 121(b) directs that a decision on such a motion shall be rendered "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law."  The moving party bears the burden of demonstrating that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994).  Facts are viewed in the light most favorable to the nonmoving party. Id.  However, where a motion for summary judgment has been properly made and supported, the opposing party may not rest upon mere allegations or denials in that party's pleadings but must by affidavits or otherwise set forth specific facts showing that there is a genuine issue for trial.  Rule 121(d); see also Celotex

<u>Corp. v. Catrett</u>, 477 U.S. 317 (1986); <u>King v. Commissioner</u>, 87 T.C. 1213, 1217 (1986).

Petitioners contend that the instant cases are ripe for summary judgment, and they have submitted numerous affidavits from the parties involved in MidCoast's acquisition of the Holiday Bowl stock, including Mrs. Hawk, Mr. Kelley, Mr. Thomas, Mr. Johnson, Ms. Colletti, Mr. Hansell, and Mr. Wellington, among others. Those affidavits and their attachments establish the above facts for the purpose of deciding the instant motions.[4] In opposition to petitioners' motions, respondent has not produced any affidavits or otherwise set forth any evidence to contradict the facts alleged in petitioners' affidavits. However, respondent contends that there are disputed issues of material fact and that summary judgment therefore is not appropriate. Additionally, respondent relies upon Rule 121(e), which provides:

---

[4]As the moving party, petitioners have the burden of establishing that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. <u>See</u> Rule 121(b); <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), <u>aff'd</u>, 17 F.3d 965 (7th Cir. 1994). We view the facts in the light most favorable to respondent. <u>See</u> <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. at 520. However, respondent ultimately will have the burden of proof under sec. 6902(a) at trial, and it is therefore possible that there could be a variance between the facts established for the purpose of deciding the instant motions and the ultimate facts decided at trial.

> When Affidavits Are Unavailable:  If it appears from the affidavits of a party opposing the motion that such party cannot for reasons stated present by affidavit facts essential to justify such party's opposition, then the Court may deny the motion or may order a continuance to permit affidavits to be obtained or other steps to be taken or may make such other order as is just.  If it appears from the affidavits of a party opposing the motion that such party's only legally available method of contravening the facts set forth in the supporting affidavits of the moving party is through cross-examination of such affiants or the testimony of third parties from whom affidavits cannot be secured, then such a showing may be deemed sufficient to establish that the facts set forth in such supporting affidavits are genuinely disputed.

Respondent contends that the only available methods for contradicting the facts set forth in petitioners' affidavits are to cross-examine the affiants or to obtain depositions or affidavits from other MidCoast employees.  Respondent contends that the latter option is unavailable because of an ongoing criminal investigation of MidCoast.

II.     Respondent's Theory of the Cases

Respondent contends that the transaction by which the stock of Holiday Bowl was sold to MidCoast (transaction) was actually an intermediary transaction and that the substance of the transaction should control transferee liability.  Respondent contends that a typical intermediary transaction involves a closely held corporation that:  (1) has recognized significant taxable gain from the sale of its assets; (2) has insufficient tax benefits to offset the resulting tax liability; (3) has no other liabilities;

and (4) holds only cash.  A promoter "purchases" the stock from the shareholders at a price equal to its net value less a percentage (typically 50%) of the corporation's tax liability.  Effectively, the corporation's own cash is used to pay the shareholders for their stock.  To the extent the corporation has any cash after the stock purchase, it is removed by the purchaser and the corporation is rendered insolvent and unable to pay its corporate tax liability.  The Commissioner is unable to collect the unpaid tax from the corporation because it has no assets or from the promoter because the promoter does not receive any direct transfers and uses foreign entities and bank accounts.

Respondent has asserted three alternative grounds for holding petitioners liable for Holiday Bowl's unpaid taxes.  We will address only one of those grounds because, as we explain below, we conclude that there are disputed issues of material fact with respect to that theory and, accordingly, we will deny petitioners' motions for summary judgment.

III.    Transferee Liability

Section 6901(a) provides that the liability, at law or in equity, of a transferee of property "shall * * * be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred".  Section 6901(a) does not independently

impose tax liability upon a transferee but rather provides a procedure through which the Commissioner may collect from a transferee unpaid taxes owed by the transferor of the assets if an independent basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts. Commissioner v. Stern, 357 U.S. 39, 45 (1958); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993). Accordingly, the elements of liability are governed by State law, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability. Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148 (1961). The Commissioner bears the burden of proving that the transferee is liable as a transferee of property of a taxpayer, but not to prove that the taxpayer was liable for the tax. Sec. 6902(a); Rule 142(d).

Because the existence and extent of transferee liability is determined by the law of the State where the transfer occurred, in the instant cases we look to the law of Tennessee.[5] See Commissioner v. Stern, 357 U.S. at 45; Rubenstein v. Commissioner, 134 T.C. 266, 270 (2010). Tennessee has adopted the Uniform Fraudulent Transfer Act (TUFTA), which provides creditors with certain

---

[5]The parties agree that the transfer of the Holiday Bowl stock took place in Tennessee.

remedies, including avoidance, when a debtor makes a fraudulent transfer. See

Tenn.Code Ann. secs. 66-3-305 to 66-3-313 (2004). TUFTA provides that certain

transfers to present and future creditors are fraudulent in the following

circumstances:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Id. sec. 66-3-305(a). In cases involving fraudulent conveyances, the burden of

proof is on the creditor to establish fraud, and the creditor must show that the

conveyance was made without fair consideration, leaving the grantor insolvent or

made with actual intent to hinder, delay, or defraud creditors. Hicks v. Whiting, 258

S.W. 784 (Tenn. 1924); Macon Bank & Trust Co. v. Holland, 715 S.W.2d 347 (Tenn. Ct. App. 1986); see also Tenn. Code Ann. secs. 66-3-101, 66-3-305.

As we explained in Starnes v. Commissioner, T.C. Memo. 2011-63, the Uniform Fraudulent Transfer Act derived the phrase "reasonably equivalent value" from the Bankruptcy Code, 11 U.S.C. sec. 548. See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 577 (7th Cir. 1998). Courts have construed reasonably equivalent value to include both direct and indirect benefits to the transferor. See id. at 578. Whether a debtor received reasonably equivalent value is a question of fact that is "based upon the facts and circumstances of each particular case". Staats v. Butterworth Props., Inc. (In re Humble), 19 Fed. Appx. 198, 200 (6th Cir. 2001); see also Ingalls v. Erlewine (In re Erlewine), 349 F.3d 205, 209 (5th Cir. 2003).

Respondent contends that the transaction in which the Holiday Bowl stock was sold to MidCoast was merely a disguised liquidation in which the assets of Holiday Bowl were distributed to its shareholders. Respondent contends that the cash the shareholders received from the sale of their Holiday Bowl stock was, in reality, Holiday Bowl's cash and that Holiday Bowl emerged from the transaction insolvent because it did not have the cash to satisfy its tax liabilities. In contrast, petitioners contend that Holiday Bowl was solvent after the transaction and that the funds to purchase the Holiday Bowl stock came from cash MidCoast had on hand

and from a loan Sequoia Capital made to MidCoast. Respondent contends that there is no evidence that Sequoia Capital gave a loan to MidCoast or that the funds distributed to petitioners came from anywhere other than the assets of Holiday Bowl. The source of those funds is material because, potentially, it could show that there was an outside infusion of cash, contradicting respondent's theory of the cases. Although respondent will be required to prove his theory at trial, for purposes of their motion for summary judgment petitioners must show that there is no disputed issue of material fact. See Rule 121(d).

The affidavits and attached documents petitioners submitted do not establish the source of the funds used to purchase the Holiday Bowl stock. Petitioners provided insufficient evidence to establish that a loan was obtained from Sequoia Capital or that MidCoast otherwise deposited cash into the Morris Manning escrow account before the closing of the transaction.[6] Petitioners also provided insufficient evidence to establish that Holiday Bowl was solvent after the transaction.

---

[6]Petitioners provided no documents or affidavits establishing that a loan was made from Sequoia Capital to MidCoast, and they provided no documents verifying the transfers into and out of the escrow account. Although a few of the affiants stated that certain funds were deposited into or received from the escrow account on the date of closing, petitioners provided no actual documentation of those transfers, and respondent objected that those statements were hearsay. We agree with respondent's objections and, therefore, do not consider those statements for purposes of the instant motions.

If, as respondent contends, Holiday Bowl's cash was used to pay petitioners for their stock, then Holiday Bowl would not have received reasonably equivalent value in exchange for that transfer and the assets of Holiday Bowl after the transaction would have been insufficient to satisfy its tax liabilities. Accordingly, the transaction would be avoidable pursuant to Tenn. Code Ann. sec. 66-3-305(a)(2). Because the record contains insufficient evidence to establish that the source of the funds used to purchase the Holiday Bowl stock was a loan from Sequoia Capital and that Holiday Bowl was solvent after the transaction, we conclude that there are disputed issues of material fact.[7] Accordingly, we will deny petitioners' motions for summary judgment.

---

[7]As stated supra note 4, at trial respondent will have the burden of proof pursuant to sec. 6902(a), and it is possible that petitioners could prevail in the event respondent fails to establish these disputed facts. In other similar cases concerning transactions to which MidCoast was a party, we have reached conclusions that varied with the facts in each case. We have decided several of those cases in favor of the taxpayers because the Commissioner failed to carry his burden of proof with regard to transferee liability. See Frank Sawyer Trust of May 1992 v. Commissioner, T.C. Memo. 2011-298; Starnes v. Commissioner, T.C. Memo. 2011-63. Similarly, in Slone v. Commissioner, T.C. Memo. 2012-57, we rejected the Commissioner's substance over form argument and held in favor of the taxpayer because we concluded that the taxpayer took reasonable steps to investigate the transaction and had no reason to believe it was illegitimate. In contrast, in Feldman v. Commissioner, T.C. Memo. 2011-297, we concluded that the evidence showed that the transaction was a sham and that the taxpayer was aware that MidCoast had no intention of paying the tax liabilities of the corporation it was acquiring.

IV.    Respondent's Motion for Stay of Proceedings

Respondent has moved for a stay of proceedings pending the resolution of a criminal investigation of MidCoast. Respondent contends that it has been the longstanding policy of the Commissioner to delay civil proceedings until the conclusion of criminal proceedings to avoid potential conflicts between the rules of criminal and civil discovery. Respondent cites three cases that he contends support his motion to stay the civil proceedings until criminal proceedings have concluded. Petitioners oppose respondent's motion for a stay of proceedings. They contend that respondent has had ample time to investigate the facts of the instant cases, that respondent has yet to uncover facts sufficient to support respondent's theory of the cases, and that respondent's motion to stay is an attempt to further delay the resolution of petitioners' cases in the vain hope that evidence will yet emerge that supports respondent's argument.

We have considered the cases respondent cites, but they are inapposite and do not support his contentions in the instant cases. The first case, Badaracco v. Commissioner, 693 F.2d 298 (3d Cir. 1982), rev'g T.C. Memo. 1981-404, supports only the proposition that it is the Commissioner's policy to defer civil assessment until the completion of related criminal proceedings against the taxpayer. The rationale behind that policy is that it avoids "serious constitutional problems that

could be created by simultaneous proceedings, problems which can limit, for example, the availability of the ordinary tools for investigating civil tax liability once the commitment is made to refer a case for criminal prosecution." Id. at 302. Similarly, in Campbell v. Eastland, 307 F.2d 478 (5th Cir. 1962), the Court of Appeals for the Fifth Circuit held that the trial court erred when it declined to stay the civil proceedings by the taxpayer until the conclusion of criminal proceedings against the taxpayer. The taxpayer sought to use the civil proceeding as a means to circumvent the normal rules of discovery in a criminal trial. Id. at 488. The Court of Appeals admonished: "In handling motions for a stay of a civil suit until the disposition of a criminal prosecution on related matters and in ruling on motions under the civil discovery procedures, a judge should be sensitive to the difference in the rules of discovery in civil and criminal cases." Id. at 487. However, in the instant cases respondent is not pursuing a criminal prosecution against petitioners, and respondent has not contended that permitting the instant cases to move forward would inhibit the Government's criminal investigation of MidCoast.

The third case respondent cites, United States v. Kordel, 397 U.S. 1 (1970), serves only to highlight that some witnesses facing criminal prosecution may be unwilling to testify in a civil trial without asserting their Fifth Amendment privilege

to avoid self-incrimination.  Nonetheless, in Kordel the Government had pursued, contemporaneously with criminal proceedings against the defendants, civil proceedings against the corporation of which the defendants served as officers.  The Supreme Court rejected the defendants' arguments that, by pursuing those actions simultaneously, the Government had deprived them of their Fifth Amendment rights because the defendants contended that they were compelled to respond to interrogatories in the civil case against the corporation.  The Court noted that the defendants had been free to assert their Fifth Amendment rights not to answer the interrogatories directed at the corporation, but they had failed to do so.  In a footnote in Kordel, 397 U.S. at 770 n.27, the Court stated:  "Federal courts have deferred civil proceedings pending the completion of parallel criminal prosecutions when the interests of justice seemed to require such action, sometimes at the request of the prosecution".  The Court then cited a number of cases where District Courts have granted motions by the prosecution to stay civil proceedings, but the primary concern in each of those cases was, again, that the defendant might use theliberaldiscovery rules in the civil case to circumvent the rules of criminal discovery.[8]  That concern does not apply to the instant cases.

---

[8]See United States v. Article of Drug, 43 F.R.D. 181, 187 n.8 (D. Del. 1967); United States v. One 1964 Cadillac Coupe DeVille, 41 F.R.D. 352, 353-354

(continued...)

In contrast, in <u>Acock, Schlegel Architects, Inc. v. Commissioner</u>, T.C. Memo. 1991-633, we denied the Commissioner's motion for a stay of proceedings where the criminal investigation was of a witness other than the taxpayer.  In that case, we did not find compelling the Commissioner's contention that a stay was warranted because the possible testimony of an important witness might have been inhibited by a criminal investigation of which he was a target.  We noted:

> There is a second and more striking difference between petitioner's cases and other cases * * * in which the court has entertained motions for a * * * stay of proceeding.  The "taxpayer" in the instant cases -- petitioner corporation herein -- is not the same entity or person against whom criminal charges are pending.  Petitioner corporation was never named as a target of the criminal investigation in these cases.  * * *

<u>Id.</u>  The instant cases are similar to <u>Acock, Schlegel Architects, Inc.</u> in that petitioners are not targets of the criminal investigation of MidCoast.  Respondent's contention that the testimony of certain MidCoast employees might be inhibited by the criminal investigation is, at this stage, purely conjectural.  Moreover, respondent's contention is at odds with the undisputed fact that, in other cases

---

[8](...continued)
(S.D.N.Y. 1966); <u>United States v. $2,437.00 U.S. Currency</u>, 36 F.R.D. 257 (E.D.N.Y. 1964); <u>United States v. Steffes</u>, 35 F.R.D. 24 (D. Mont. 1964); <u>United States v. Maine Lobstermen's Ass'n</u>, 22 F.R.D. 199 (D. Me. 1958); <u>United States v. Cigarette Merchandisers Ass'n</u>, 18 F.R.D. 497 (S.D.N.Y. 1955); <u>United States v. Linen Supply Inst. of Greater N.Y.</u>, 18 F.R.D. 452 (S.D.N.Y. 1955); <u>United States v. Bridges</u>, 86 F. Supp. 931, 933 (N.D. Cal. 1949).

involving MidCoast, respondent has taken the depositions of numerous MidCoast employees, including the individuals who served as MidCoast's president, general counsel, and controller during 2003.[9] We conclude that the criminal investigation of MidCoast does not warrant a stay of the instant proceedings at this time. Accordingly, we will deny respondent's motion for a stay of proceedings.

In reaching these holdings, we have considered all the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.

---

[9]It is unclear whether the criminal investigation was in progress at the time those depositions were taken during 2006. Respondent states that respondent learned of the criminal investigation only on April 19, 2011.