T.C. Memo. 2012-259

UNITED STATES TAX COURT

BILLY F. HAWK, JR., GST NON-EXEMPT MARITAL TRUST, TRUSTEE,
TRANSFEREE, NANCY SUE HAWK AND REGIONS BANK,
CO-TRUSTEES, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket Nos. 30024-09, 30025-09,       Filed September 10, 2012.
30026-09, 30515-09.

---

[1]Cases of the following petitioners are consolidated herewith for the purpose of this opinion: Estate of Billy F. Hawk, Jr., Trustee, Transferee, Nancy Sue Hawk and Regions Bank, Co-Executors, docket No. 30025-09; Billy F. Hawk, Jr., GST Exempt Marital Trust, Trustee, Transferee, Nancy Sue Hawk and Regions Bank, Co-Trustees, docket No. 30026-09; and Nancy Sue Hawk, Transferee, docket No. 30515-09.

[*]This opinion supplements Hawk v. Commissioner, T.C. Memo. 2012-154.

**[\*2]**  Dale C. Allen and J. Eric Butler, for petitioners in docket Nos. 30024-09, 30025-09, and 30026-09.

John P. Konvalinka and Richard G. Pearce, Jr., for petitioner in docket No. 30515-09.

Rebecca Dance Harris, for respondent.

SUPPLEMENTAL MEMORANDUM OPINION

WELLS, Judge:  Respondent determined that petitioners Billy F. Hawk, Jr., GST Non-Exempt Marital Trust, Nancy Sue Hawk and Regions Bank, cotrustees; Estate of Billy F. Hawk, Jr., Nancy Sue Hawk and Regions Bank, coexecutors; Billy F. Hawk, Jr., GST Exempt Marital Trust, Nancy Sue Hawk and Regions Bank, cotrustees; and Nancy Sue Hawk are each liable as transferees for the 2003 Federal income tax liability of Holiday Bowl, Inc., of $965,358 and penalties pursuant to section 6662(b) and (h) of $8,035 and $370,072, respectively.  In an opinion filed on May 30, 2012, Hawk v. Commissioner, T.C. Memo. 2012-154, 2012 WL 1947846 (prior opinion), we denied petitioners' motions for summary

**[*3]** judgment in the instant cases. Petitioners have moved, pursuant to Rule 161, that we reconsider our prior opinion.[2]

Background

Many of the underlying facts are set out in detail in our prior opinion and are incorporated herein by reference. We summarize the factual and procedural background briefly here and make additional findings as required for our ruling on petitioners' motion for reconsideration. The facts are based upon examination of the pleadings, moving papers, responses, and attachments, including numerous affidavits supplied by petitioners.

Billy F. Hawk, Jr., died during February 2000, leaving behind his wife, Nancy Sue Hawk, and several children. At the time of his death, Mr. Hawk was the majority shareholder and chief executive officer of Holiday Bowl, Inc. (Holiday Bowl), a Tennessee corporation that operated two bowling alleys in Chattanooga, Tennessee. After the administration of Mr. Hawk's estate, all of Mr. Hawk's shares of stock (stock) in Holiday Bowl passed to Mrs. Hawk and the Billy F. Hawk, Jr., Exempt Marital Trust and the Billy F. Hawk, Jr., GST Non-Exempt Marital Trust (trusts).

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[*4]** Mrs. Hawk and Rob Kelley, vice president and trust officer of Regions Bank and cotrustee of the trusts, decided to sell Holiday Bowl. To do so, they worked with Mr. Hawk's longtime attorney, Wayne F. Thomas with the law firm Chambliss, Bahner & Stophel, and Dan Johnson and Rayleen Colletti, certified public accountants with the firm Johnson, Hickey & Murchison. During late 2002, Mr. Thomas contacted Sandy Hansell, a bowling alley broker, who subsequently found a purchaser for Holiday Bowl: the Corley family from Massachusetts, who owned New England Bowl, Inc. (New England Bowl). The sale of substantially all of Holiday Bowl's assets to the Corley Family Limited Partnership and New England Bowl was eventually consummated on July 1, 2003.

By March 2003, Mr. Hansell considered it likely that the Corley family would purchase Holiday Bowl. In a letter dated March 13, 2003, Mr. Hansell informed Mr. Johnson that MidCoast Credit Corp. or MidCoast Investments, Inc. (MidCoast), might be interested in purchasing the stock of Holiday Bowl following the sale of Holiday Bowl's assets to the Corley family.

Mr. Johnson subsequently spoke to Paul Wellington at MidCoast, and Mr. Wellington told Mr. Johnson that MidCoast sought to purchase Holiday Bowl to convert it into a business that would acquire discounted loan portfolios and generate profits by collecting on those loans. Mr. Wellington sent Mr. Johnson

[*5] materials explaining MidCoast's business model, including its method of acquiring cash-rich corporations with tax liabilities, and those materials stated that MidCoast would satisfy the acquired corporation's tax liabilities.

In a letter dated August 14, 2003, Mr. Thomas advised Mrs. Hawk and Mr. Kelley that he and other attorneys at Chambliss, Bahner & Stophel had concluded that "it would be a reasonable exercise of * * * [Mrs. Hawk's and Mr. Kelley's] discretion to proceed with this transaction provided that MidCoast provides sufficient financial information so we may all be satisfied that it has the financial strength to fulfill its indemnity". Mrs. Hawk and Mr. Kelley decided to sell the Holiday Bowl stock to MidCoast.

The purchase price for the Holiday Bowl stock was calculated by taking the cash assets then held by Holiday Bowl ($4,185,389), adding prepaid taxes ($29,980), and subtracting an amount equal to 64.25% of Holiday Bowl's 2003 tax liability ($791,690). That formula yielded a purchase price of $3,423,679. The parties agreed that the sale of the Holiday Bowl stock would close on November 12, 2003, at the offices of Chambliss, Bahner & Stophel in Chattanooga, Tennessee, unless the parties mutually agreed to close the transaction via mail, fax, or overnight courier.

[*6]   Mr. Thomas believed that MidCoast was financing the purchase of Holiday Bowl through a combination of cash that it had on hand and a loan from Sequoia Capital, LLC (Sequoia Capital), an offshore entity.  During November 2003 Holiday Bowl, Midcoast, and Sequoia Capital entered into an escrow agreement with the Atlanta, Georgia, law firm Morris, Manning & Martin L.L.P. (Morris Manning). Morris Manning agreed to serve as the escrow agent.  Pursuant to that escrow agreement, Holiday Bowl's cash and the purchase funds borrowed by MidCoast from Sequoia Capital were to be deposited into Morris Manning's escrow account and Holiday Bowl's cash was not to be released to MidCoast until the Holiday Bowl shareholders received the purchase price.

The Share Purchase Agreement pursuant to which MidCoast acquired Holiday Bowl's stock stipulated that the purchaser would prepare and file all tax returns and pay all taxes due for the tax period ending December 31, 2003.  Mrs. Hawk, Mr. Kelley, and the representatives of Holiday Bowl believed that MidCoast would file tax returns and pay Holiday Bowl's tax liability for its 2003 tax year, and they did not expect that, following its acquisition of Holiday Bowl, MidCoast would promptly sell Holiday Bowl to another entity.

However, immediately after the sale of the Holiday Bowl stock closed on November 12, 2003, MidCoast resold the Holiday Bowl stock to Sequoia Capital.

**[*7]** On July 8, 2004, Holiday Bowl filed its Form 1120, U.S. Corporation Income Tax Return. It reported a total gain from the sale of its assets on July 1, 2003, of $2,694,726. It also reported losses from transactions described only as "Int Rate Swap Opti" and "DKK/USD Bina" and reported an overall taxable loss of $1,267,260. During 2005, respondent began an examination of Holiday Bowl's 2003 income tax return and requested that Holiday Bowl provide documents substantiating the claimed losses, but no documentation was provided. On July 11, 2007, respondent issued a notice of deficiency to Holiday Bowl for income tax deficiencies of $965,358, $599, and $2 with respect to Holiday Bowl's 2003, 2004, and 2005 tax years, respectively. Respondent also determined that Holiday Bowl was liable for penalties with respect to its 2003 tax year of $8,035 and $370,072 pursuant to section 6662(b) and (h), respectively.

Before the expiration of the time prescribed by section 6901(c), Mrs. Hawk, individually, and Mrs. Hawk and Mr. Kelley, as cotrustees of the trusts and coexecutors of the Estate of Billy F. Hawk, Jr., timely executed a Form 977, Consent to Extend the Time to Assess Liability at Law or in Equity for Income, Gift, and Estate Tax Against a Transferee or Fiduciary. On September 23 and 29, 2009, respondent timely issued statutory notices of liability setting forth

**[\*8]** respondent's determination of petitioners' liabilities as transferees.[3]  In the attached notice of liability statements, respondent determined that Holiday Bowl had been dissolved and that the assets of Holiday Bowl had been transferred to petitioners, who were, directly or indirectly, the shareholders of Holiday Bowl.

Petitioners timely filed their petitions in this Court.  In his answer to petitioners' petitions, respondent contended that petitioners were liable for Holiday Bowl's taxes as transferees within the meaning of section 6901 and the Tennessee Uniform Fraudulent Transfer Act (TUFTA), Tenn. Code Ann. secs. 66-3-305 to 66-3-313 (2004).

Petitioners filed motions for summary judgment.  Respondent opposed petitioners' motions, and, in his response, he contended that petitioners were liable as transferees under TUFTA, a substance-over-form analysis recasting the transaction as a liquidation, Tennessee's corporate dissolution statute, see Tenn. Code Ann. sec. 48-24-107 (2004), and the Tennessee "trust fund" doctrine, see Kradel v. Piper Indus., Inc., 60 S.W.3d 744, 756 (Tenn. 2001).  In their response to respondent's opposition to petitioners' motions for summary judgment, petitioners

---

[3]Respondent issued the notices on September 23, 2009, in the cases at docket Nos. 30024-09 and 30515-09 and on September 29, 2009, in the cases at docket Nos. 30025-09 and 30026-09.

**[\*9]** contended that several of respondent's theories of recovery were new and untimely raised.[4]

On May 30, 2012, we filed our prior opinion denying petitioners' motions for summary judgment because we concluded that genuine issues of material fact remained. In our prior opinion, we decided that, because, even under respondent's TUFTA analysis, genuine issues of material fact remained, it was unnecessary to consider any of respondent's alternative theories or to decide whether those theories were new and untimely.

## Discussion

Reconsideration pursuant to Rule 161 is intended to correct substantial errors of fact or law and allow the introduction of newly discovered evidence that the moving party could not have introduced, by the exercise of due diligence, in the prior proceeding. Estate of Quick v. Commissioner, 110 T.C. 440, 441 (1998). We have discretion to grant a motion for reconsideration but will not do so unless

---

[4]It is unclear to which theories petitioners specifically object because they inconsistently refer to the theories asserted by respondent. We assume that petitioners contend that the three latter theories (a substance-over-form analysis recasting the transaction as a liquidation, Tennessee's corporate dissolution statute, and the Tennessee "trust fund" doctrine) are new theories. Without deciding whether those theories are actually separate and distinct from respondent's original theory of recovery under sec. 6901 and TUFTA, we will refer to them as respondent's alternative theories.

**[\*10]** the moving party can point to unusual circumstances or substantial error.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Vaughn v. Commissioner</u>, 87 T.C. 164, 166-167 (1986).  "Reconsideration is not the appropriate forum for rehashing previously rejected legal arguments or tendering new legal theories to reach the end result desired by the moving party." <u>Estate of Quick v. Commissioner</u>, 110 T.C. at 441-442; <u>see also</u> <u>Estate of Turner v. Commissioner</u>, 138 T.C. ___, ___ (slip op. at 3) (Mar. 29, 2012).

In their motion for reconsideration, petitioners contend that we erred in our prior opinion by (1) declining to hold that respondent's alternative theories were untimely "new theories" that should not be allowed to be raised; and (2) placing the burden on petitioners to "conclusively establish the existence of a loan in this case before being entitled to summary judgment, when the burden of creating a genuine issue of fact for trial on this statutory element lies with Respondent."

In support of their contention that respondent's alternative theories are untimely new theories that may not now be raised by respondent, petitioners cite <u>Slone v. Commissioner</u>, T.C. Memo. 2012-57.  In that opinion, we declined to consider a theory raised by the Commissioner for the first time at trial and on brief. In <u>Slone</u>, we cited several other Opinions in which we similarly held that theories raised for the first time at trial or on brief are untimely and will not be considered.

**[*11]** See Estate of Mandels v. Commissioner, 64 T.C. 61 (1975); Estate of Horvath v. Commissioner, 59 T.C. 551 (1973); Frentz v. Commissioner, 44 T.C. 485 (1965), aff'd per order, 375 F.2d 662 (6th Cir. 1967).  In contrast, in the instant cases, respondent raised alternative theories in response to petitioners' motions for summary judgment, well before trial.  It is well established that the Commissioner may rely upon a theory if he has provided the taxpayer with "fair warning" of his intention to proceed under that theory.  Leahy v. Commissioner, 87 T.C. 56, 64 (1986); Schuster's Express, Inc. v. Commissioner, 66 T.C. 588, 593 (1976), aff'd per curiam, 562 F.2d 39 (2d Cir.1977); Rubin v. Commissioner, 56 T.C. 1155, 1163 (1971), aff'd, 460 F.2d 1216 (2d Cir.1972).  "Fair warning means that respondent's failure to give petitioner notice of his intention to rely on a particular theory in the statutory notice of deficiency or the pleadings, must not have caused harm or prejudice to petitioner in petitioner's ability to prepare its case."  William Bryen Co. & Subs. v. Commissioner, 89 T.C. 689, 707 (1987).

In the instant cases, petitioners received notice of respondent's alternative theories well before trial.  Additionally, petitioners acknowledge that respondent's alternative theories are not surprising.  In their motion for reconsideration, they state:  "It should be noted that Respondent's new theories of recovery in this case are the same or similar theories he raised in Starnes".  Moreover, we did not rely

**[*12]** upon respondent's alternative theories in our prior opinion when we decided to deny petitioners' motions for summary judgment. There remains sufficient time before trial for petitioners to respond to respondent's alternative theories. Accordingly, we conclude that petitioners have not been prejudiced in any way by respondent's assertion, in his response to petitioners' motions for summary judgment, of respondent's alternative theories and, consequently, they are not new theories that cannot be raised at this time.

Secondly, petitioners contend that we erred in denying their motions for summary judgment because we required that petitioners "conclusively establish the existence of a loan in this case before being entitled to summary judgment, when the burden of creating a genuine issue of fact for trial on this statutory element lies with Respondent." Petitioners apparently misread our prior opinion and misunderstand the requirements of Rule 121.

Rule 121(b) directs that a decision on a motion for summary judgment shall be rendered "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits or declarations, if any, show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law." When a party moves for summary judgment, that party, i.e., petitioners in the instant cases, bears the burden of

**[\*13]** proving that there is no genuine issue of material fact, and factual inferences are viewed in the light most favorable to the nonmoving party. Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). To establish that there is no genuine issue of material fact, Rule 121(d) requires that any supporting affidavits or declarations "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant \* \* \* is competent to testify to the matters stated therein." "When a motion for summary judgment is made and supported as provided in \* \* \* [Rule 121], an adverse party may not rest upon the mere allegations or denials of such party's pleading". Rule 121(d).

Section 6901(a) provides that the liability, at law or in equity, of a transferee of property "shall \* \* \* be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred". Section 6901(a) does not independently impose tax liability upon a transferee but rather provides a procedure through which the Commissioner may collect from a transferee unpaid taxes owed by the transferor of the assets if an independent basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts. Commissioner v. Stern, 357 U.S. 39, 45 (1958); Hagaman

**[*14]** <u>v. Commissioner</u>, 100 T.C. 180, 183 (1993). Accordingly, the elements of liability are governed by State law, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability. <u>Ginsberg v. Commissioner</u>, 305 F.2d 664, 667 (2d Cir. 1962), <u>aff'g</u> 35 T.C. 1148 (1961). The Commissioner bears the burden of proving that the transferee is liable as a transferee of property of a taxpayer, but not to prove that the taxpayer was liable for the tax.[5] Sec. 6902(a); Rule 142(d).

Because the existence and extent of transferee liability is determined by the law of the State where the transfer occurred, in the instant cases we look to the law of Tennessee.[6] <u>See</u> <u>Commissioner v. Stern</u>, 357 U.S. at 45; <u>Rubenstein v. Commissioner</u>, 134 T.C. 266, 270 (2010). TUFTA provides creditors with certain remedies, including avoidance, when a debtor makes a fraudulent transfer. <u>See</u> Tenn. Code Ann. secs. 66-3-305 to 66-3-313. TUFTA provides that certain

---

[5]Petitioners appear not to appreciate that, as the moving party, they bear the burden of proof as to any factual issue. Although respondent will be required to prove the transferees' liability at trial, for purposes of petitioners' motion for summary judgment petitioners must prove that no genuine dispute exists as to any material fact. <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), <u>aff'd</u>, 17 F.3d 965 (7th Cir.1994).

[6]The parties agree that the transfer of the Holiday Bowl stock took place in Tennessee.

**[*15]** transfers to present and future creditors are fraudulent in the following circumstances:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Id. sec. 66-3-305(a). In cases involving fraudulent conveyances, the burden of proof is on the creditor to establish fraud, and the creditor must show that the conveyance was made without fair consideration, leaving the grantor insolvent or made with actual intent to hinder, delay, or defraud creditors. Hicks v. Whiting, 258 S.W. 784 (Tenn. 1924); Macon Bank & Trust Co. v. Holland, 715 S.W.2d 347 (Tenn. Ct. App. 1986); see also Tenn. Code Ann. secs. 66-3-101, 66-3-305.

[*16] As we explained in our prior opinion and in Starnes v. Commissioner, T.C. Memo. 2011-63, aff'd, 608 F.3d 417 (4th Cir. 2012), the Uniform Fraudulent Transfer Act derived the phrase "reasonably equivalent value" from the Bankruptcy Code, 11 U.S.C. sec. 548. See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 577 (7th Cir. 1998). Courts have construed reasonably equivalent value to include both direct and indirect benefits to the transferor. See id. at 578. Whether a debtor received reasonably equivalent value is a question of fact that is "based upon the facts and circumstances of each particular case". Staats v. Butterworth Props., Inc. (In re Humble), 19 Fed. Appx. 198, 200 (6th Cir. 2001); see also Ingalls v. Erlewine (In re Erlewine), 349 F.3d 205, 209 (5th Cir. 2003).

As noted in our prior opinion, petitioners contend that Holiday Bowl deposited cash into an escrow account and that petitioners received cash from that escrow account on the same day, pursuant to a purported stock sale. Hawk v. Commissioner, 2012 WL 1947846, at *7 n.6. However, the evidence that petitioners offer in support of that contention, or lack thereof, is also consistent with respondent's theory that the transaction was a disguised liquidation with a circular flow of cash and that Holiday Bowl did not receive reasonably equivalent value in the transaction.

**[\*17]** With their motion for summary judgment, petitioners submitted the affidavit of Ross Albert, an attorney with Morris Manning. Petitioners do not contend that Mr. Albert was involved in the sale of Holiday Bowl, and his affidavit was not based on any personal knowledge of the stock sale. Instead, in his affidavit Mr. Albert stated that he had examined Morris Manning's records and bank statements related to the stock sale and that those records showed that on or around November 12, 2003, Morris Manning received a wire transfer of $4,185,389 from Holiday Bowl. Petitioners did not submit the bank statements to which Mr. Albert referred in his affidavit. Neither Mr. Albert's affidavit nor any other affidavit submitted by petitioners stated anything about the receipt of proceeds from MidCoast or Sequoia Capital, nor did petitioners submit any bank records or other evidence showing the receipt of such funds into the escrow account.

Petitioners contend that Mr. Albert's affidavit shows that MidCoast's cash was deposited into the Morris Manning escrow account. However, Mr. Albert's affidavit relied on hearsay. Affidavits that rely on inadmissable hearsay instead of personal knowledge do not comply with the requirements of Rule 121(d). See Rule 121(d) ("Supporting and opposing affidavits or declarations shall be made on personal knowledge * * * [and] shall set forth such facts as would be admissible in evidence"); <u>Van Der Aa Invs., Inc. v. Commissioner</u>, 125 T.C. 1, 5

**[\*18]** (2005). Moreover, petitioners do not even contend that Mr. Albert's affidavit or any other evidence they submitted shows that purchase funds borrowed by MidCoast from Sequoia Capital were deposited into the Morris Manning escrow account.

Petitioners have pointed to no evidence that funds other than those from Holiday Bowl were deposited into the escrow account from which they received cash. Petitioners focus their attention on Starnes v. Commissioner, T.C. Memo. 2011-63, in which we held in favor of the taxpayers in a similar transaction involving MidCoast because we concluded, after trial, that the Commissioner failed to carry his burden of proof. However, petitioners either fail to appreciate or ignore the fact that our finding in Starnes that there was no circular flow of cash was central to our holding that the corporation received reasonably equivalent value. See Starnes v. Commissioner, 680 F.3d at 424 n.5; Starnes v. Commissioner, T.C. Memo. 2011-63.

Similarly, as noted in our prior opinion, petitioners pointed to no evidence that MidCoast emerged from the transaction solvent. Unlike in the instant cases, in Starnes the evidence showed that the corporation emerged from the stock sale with sufficient cash to pay its tax liabilities. See Starnes v. Commissioner, T.C. Memo. 2011-63. That finding also was central to our conclusion that, under the

**[\*19]** North Carolina Uniform Fraudulent Transfer Act, the corporation in <u>Starnes</u> was solvent after the stock sale. <u>See</u> <u>id.</u>

Additionally, petitioners ignore the fact that, as we discussed in our prior opinion, the holdings in our prior cases involving MidCoast, all of which went to trial, have not been universally in favor of the taxpayers. In <u>Feldman v. Commissioner</u>, T.C. Memo. 2011-297, we held in favor of the Commissioner, distinguishing other MidCoast cases on the basis of the facts in <u>Feldman</u> that showed that the shareholders knew that MidCoast would not pay the tax liability of the acquired corporation and facts that showed the purported loan was a sham. Even in <u>Feldman</u>, the evidence established that loan funds had been deposited into an escrow account before the distribution of cash to the shareholders, but we concluded that those loans were a sham. In contrast, in the instant cases the undisputed facts do not show anything other than a circular flow of cash, consistent with respondent's theory.

Petitioners have failed to demonstrate any unusual circumstances or substantial errors of fact or law that would justify the granting of their motion for reconsideration. In contrast to the assertions set forth in petitioners' motion for summary judgment, the evidence demonstrates that a genuine dispute of material

**[*20]** fact remains for trial.  Petitioners are not entitled to summary judgment as a matter of law.  Accordingly, we shall deny petitioners' motion for reconsideration.

We have considered all the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.